2018 WY 16

**Donald Wesley JOHNS, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

S-17-0122

Supreme Court of Wyoming.

February 9, 2018

Representing Appellant:. Office of the Public Defender: Diane Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel; Eric M. Alden, Senior Assistant Appellate Counsel. Argument by Ms. Olson.

Representing Appellee: Peter K. Michael, Attorney General; David L. Delicath, Deputy Attorney General, Christyne M. Martens, Senior Assistant Attorney General. Argument by Ms. Martens.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

KAUTZ, Justice.

*An order granting Ms. Olson's Motion to Withdraw was entered on December 13, 2017.*

[¶1] A jury convicted the appellant, Don Wesley Johns, of the first-degree murder of his roommate, Don Wickersham. Mr. Johns appeals his conviction, arguing that the district court erroneously instructed the jury in multiple ways and that the court utilized an improper stepped verdict form. We affirm.

## ISSUES

[¶2] Mr. Johns' issue statement is a blanket question of whether the district court properly instructed the jury; therefore, we re-state the issues to give them more specificity:

1. Did the district court properly instruct the jury regarding the law of self-defense and the duty to retreat?

2. Did the district court properly instruct the jury regarding the State's burden of proof regarding a "sudden heat of passion" in voluntary manslaughter?

3. Did the district court utilize an improper stepped verdict which prohibited the jury from considering "sudden heat of passion" as a mitigating factor?

4. Did the district court err when it did not provide the jury a definition of "recklessly" or "enhanced recklessness" within the instruction defining malice in second-degree murder?

### FACTS

[¶3] During the afternoon and evening of August 29, 2015, Mr. Johns and Mr. Wickersham hosted a few people at their apartment while Mr. Johns received a tattoo from Shane Erickson. Among the guests were Mr. Erickson's fiancé, Jamie Geesy, Damian Gaylord, and Carmen Dimas. Although both Mr. Johns and Mr. Wickersham had been drinking alcohol, the witnesses described Mr. Johns as "belligerent," "loud," and "up in people's faces," while Mr. Wickersham was "laid back, really mellow" and "level headed." However, Mr. Johns and Mr. Wickersham argued with one another about the music being played at the party and Mr. Johns' rent payment. Mr. Johns was yelling and "getting crazy" and Mr. Wickersham told Mr. Johns that if he did not calm down and stop arguing he would need to leave. At one point in time, Mr. Wickersham asked Mr. Gaylord to be a "referee" between he and Mr. Johns. Mr. Wickersham left the apartment with Mr. Erickson and Ms. Geesy to buy more alcohol as a means of temporarily getting away from Mr. Johns.

[¶4] Sometime during the party, Mr. Wickersham began showing the guests some of his knife and sword collection. Ms. Geesy explained that Mr. Wickersham was simply showing the knives and was not acting in a threatening manner. This sentiment was shared by Mr. Erickson. Mr. Gaylord observed Mr. Wickersham "posture" towards Mr. Johns while he was holding two of the knives, but there was twenty feet between the two men and Mr. Gaylord did not consider Mr. Wickersham a threat to anyone at the party. Ms. Geesy and Mr. Erickson, however, did not recall seeing Mr. Wickersham "posture" or act otherwise threatening towards Mr. Johns. Ms. Geesy and Mr. Erickson left the apartment at approximately 8:00 p.m. Mr. Gaylord left the apartment by 8:45 p.m. Ms. Geesy and Mr. Gaylord both conveyed that they did not witness any physical altercations between Mr. Wickersham and Mr. Johns at the apartment.

[¶5] Later that evening, Michael Izatt, a resident in the apartment complex, was on his deck when he was approached by Mr. Johns. Mr. Johns took Mr. Izatt to the apartment and Mr. Izatt observed Mr. Wickersham lying face down on an ottoman. The two left the apartment and Mr. Johns asked Mr. Izatt if he could keep his belongings in Mr. Izatt's apartment. Mr. Izatt told him he could not, and Mr. Johns left. Mr. Izatt later returned to his deck and found an 18-pack of beer and a knife covered in blood. Mr. Izatt placed the knife in the beer box and put them in the garbage can behind the apartment complex. He did not call the police to report the incident.

[¶6] At approximately 9:00 p.m., Mr. Johns arrived at the home of Kelly Stanley, who lived four or five blocks from Mr. Johns' apartment. Mr. Johns was drunk, sweating profusely, and had a cut on his finger which was wrapped in a washcloth. He told Ms. Stanley that he needed help, he had gone too far, and that he had killed Mr. Wickersham. Ms. Stanley arranged a ride for Mr. Johns and then contacted her friend, Suzanne Thornton, and asked her to check on Mr. Wickersham. She did not call the police to report the situation.

[¶7] Ms. Thornton and Matt Epperson went to the apartment and found Mr. Wickersham's body. Mr. Epperson made an anonymous 911 call but emergency personnel were unable to find the location. In the meantime, Mr. Johns arrived at the home of his friend, Chris Keck. Mr. Johns told Mr. Keck that he had cut his finger with a box

cutter, and the two spent most of the night trying to get the finger to stop bleeding.

[¶8] The next morning, another resident of the apartment complex went to Mr. Johns' apartment because water was leaking through the ceiling into the apartment below. Upon arrival, the resident found Mr. Wickersham's body with multiple puncture wounds and immediately called 911. When the police arrived, they found blood throughout the apartment, a large sword in the bathtub, and the knife in the garbage can behind the house. Mr. Johns was arrested later that day after contacting the police. An autopsy showed Mr. Wickersham had suffered twenty-nine sharp force injuries of which twenty-four were stab wounds. He suffered seven injuries to his head and neck, fifteen to the torso and back, and seven to his extremities. Some of the injuries were consistent with wounds indicating that Mr. Wickersham had been trying to defend himself.

[¶9] The State charged Mr. Johns with one count of first-degree murder. The case proceeded to a jury trial where Mr. Johns' attorney asserted that, although Mr. Johns did kill Mr. Wickersham, he was acting in self-defense. The district court instructed the jury on the law of self-defense and included second-degree murder and voluntary manslaughter as lesser offenses on the verdict form in the event the jury did not find sufficient evidence of first-degree murder. The jury convicted Mr. Johns of first-degree murder and the district court sentenced him to life in prison without the possibility of parole. Mr. Johns filed a timely notice of appeal.

## DISCUSSION

### *Self-Defense Instructions*

■ [¶10] Mr. Johns argues that the jury instructions regarding self-defense were contradictory and confusing making it impossible for the jury to decipher the appropriate law regarding self-defense. He specifically takes issue with the following instructions:

Instruction No. 35

YOU ARE INSTRUCTED that if the Defendant, at his place of residence, had reasonable ground to believe, and actually did believe, that he was in imminent danger of death or serious bodily harm and that the use of deadly force was necessary to repel such danger, he was not required to retreat or to consider whether he could safely retreat. The Defendant was entitled to stand his ground and use such force as was reasonably necessary under the circumstances to save his life or protect himself from serious bodily harm.

Instruction No. 37

YOU ARE INSTRUCTED that in considering the claim of self-defense in this case, you must first determine whether the Defendant was the aggressor in this case or whether Mr. Wickersham was the aggressor in this case. Some sort of physical aggression or a threat of imminent use of deadly force is required before a person will be considered an aggressor. Verbal provocation without more is generally insufficient to justify an initial aggressor. If you find that the Defendant was the aggressor in this case, you should consider his duty under Instruction 38. If you find that Mr. Wickersham was the aggressor, you should review the Defendant's actions under Instruction 39.

Instruction No. 38

YOU ARE INSTRUCTED that even if the Defendant had reasonable grounds to believe and actually did believe that he was in imminent danger of death or serious bodily harm, the Defendant was justified in using deadly force to repel the danger only if he retreated as far as he safely could do before using deadly force. The law requires a person to retreat rather than to take the life of an adversary if there was a convenient mode of retreat without increasing his actual or apparent peril. To excuse a failure to retreat, it is necessary that the Defendant's peril would be increased, or that it reasonably appeared that it would be increased, by retreat. If you find that the Defendant could have safely retreated but failed to do so, the Defendant cannot rely on the justification of self-defense.

Instruction No. 39

YOU ARE INSTRUCTED that prior to resorting to deadly force, a defendant has a duty to pursue reasonable alternatives

under the circumstances. The Defendant may use deadly force only if necessary and must consider reasonable alternatives including retreating prior to using deadly force.

[¶11] With the exception of Instruction No. 35, each of these instructions was proposed in the State's pre-trial jury instruction packet, and none of the instructions were proposed by Mr. Johns. However, at the formal jury instruction conference the prosecutor specifically objected to the district court giving any self-defense instructions because Mr. Johns had not made a prima facie showing of self-defense:

> [PROSECUTOR:] We object to self-defense instructions, as they have not met their *prima facie* case, in our view.
>
> We object to the instruction that I think was Pattern 8.09, as that applies to non-deadly force. So we don't feel that's applicable here.
>
> And we object to the instruction on no duty to retreat in your own home. As our view, that is inconsistent with *Drennen*; in that, in *Drennen*, we feel if you are an aggressor, you have a duty to retreat regardless of your location.

In response, defense counsel stated:

> [DEFENSE COUNSEL:] I don't have an objection if the Court is intending to give the self-defense instructions. I think we have made our *prima facie* case, Your Honor, and—and so I think they are appropriate.
>
> And the other—the last objections by [the prosecutor] are actually contained in the self-defense instructions, as well, the different instructions. And I believe Mr. Johns is entitled to all of those instruction, Your Honor.

Immediately following the State's objections and defense counsel's response, the district court determined:

> Well, the Court is going to provide the self-defense instructions over the objection of the State. I do believe the defense has met their [sic] burden; and, granted, it is a very minimal burden of justifying the giving of those instructions.
>
> . . . .
>
> And then I believe it is the self-defense instruction on no duty to retreat when one is in one's own home. I will give that instruction, as there has been evidence presented, and it's uncontroverted, that the alleged victim and Mr. Johns did share a residence together, and that's allegedly where this offense occurred.

[¶12] Both the State and Mr. Johns assert this Court should review Mr. Johns' complaints regarding the jury instructions for plain error because Mr. Johns did not object to the instructions during the trial. The plain error standard of review requires Mr. Johns to show: "1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right resulting in material prejudice." *Schmuck v. State*, 2017 WY 140, ¶ 32, 406 P.3d 286, 297 (Wyo. 2017) (quoting *Collins v. State*, 2015 WY 92, ¶ 10, 354 P.3d 55, 57 (Wyo. 2015) ).[1] In conducting this analysis, we are cognizant that, "[a] trial court is given wide latitude in instructing the jury and, as long as the instructions correctly state the law and the instructions in their entirety sufficiently cover the relevant issue, reversible error will not be found." *Hawes v. State*, 2014 WY 127, ¶ 15, 335 P.3d 1073, 1078 (Wyo. 2014) (quoting *Gonzalez-Ochoa v. State*, 2014 WY 14, ¶ 18, 317 P.3d 599, 605 (Wyo. 2014) ).

[¶13] The jury instructions are clearly shown in the record, satisfying the first part of plain error review. However, we need not

---

1. It is arguable that defense counsel's conduct rises to the level of invited error. The transcript cited above demonstrates that Mr. Johns and his counsel explicitly advocated for the use of these instructions over the State's objection. Granted, Mr. Johns did not originally propose the instructions; however, at the time of the formal jury instruction conference, Mr. Johns knew which instructions had been proposed and he urged the district court to give them. "The doctrine of invited error prohibits a party from raising on appeal alleged trial court errors that were induced by that party's actions." *Toth v. State*, 2015 WY 86A, ¶ 45, 353 P.3d 696, 710 (Wyo. 2015). However, the State did not propose the use of the invited error doctrine and, therefore, we do not consider it any further.

determine whether the jury instructions violated a clear and unequivocal rule of law because the record is clear that Mr. Johns could not have suffered prejudice from these instructions even if they were erroneous. While the district court concluded Mr. Johns had presented a prima facie showing of self-defense, justifying the self-defense instructions, we do not reach the same conclusion.

[¶14] Before a jury must be instructed regarding self-defense, the defendant "must first present a prima facie case of each element of the affirmative defense ... including that the victim acted as the aggressor. Only then does the burden shift to the State to prove that a defendant was not acting in self-defense." *Brown v. State*, 2014 WY 104, ¶ 16, 332 P.3d 1168, 1174 (Wyo. 2014) (citing *Drennen v. State*, 2013 WY 118, ¶ 39, 311 P.3d 116, 129 (Wyo. 2013) ). Therefore, before the district court was required to instruct the jury that the State had to prove beyond a reasonable doubt that Mr. Johns did not act in self-defense, Mr. Johns was required to make a prima facie showing of the following:

(1) [that Mr. Wickersham was the aggressor in the conflict];

(2) that [Mr. Johns] believed, at the time of the killing, that he was in such immediate danger of losing his own life, or of receiving serious bodily injury, as made it necessary to take the life of his assailant;

(3) [that Mr. Johns' belief was that of a reasonable person under the circumstances]; and

(4) that there was no other reasonable method of escaping or otherwise resolving the conflict.

*Id.*; *Ramos v. State*, 806 P.2d 822, 825 (Wyo. 1991). We have described a defendant's prima facie showing as a "minimal burden" or a "slight burden," but it is a burden nonetheless that must be supported by some evidence to support a self-defense theory. *See Schmuck*, ¶ 69, 406 P.3d at 308; *Haire v. State*, 2017 WY 48, ¶ 25, 393 P.3d 1304, 1311 (Wyo. 2017). *Compare U.S. v. Branch*, 91 F.3d 699, 712 (5th Cir. 1996) ("We review the record cognizant that the 'merest scintilla of evidence' in the defendant's favor does not warrant a jury instruction regarding an affirmative defense for which the defendant bears the initial burden of production. Under *Mathews*, there must be 'evidence sufficient for a reasonable jury to find in [the defendant's] favor.' "); *Sipple v. State*, 972 So.2d 912, 915 (Fla. Dist. Ct. App. 2007) ("When self-defense is asserted in a criminal case, the defendant only has the burden of presenting some evidence to establish a prima facie case that the killing was justified.... As long as there is any evidence of self-defense presented by the defendant, the instruction is warranted."); *People v. Falconer*, 282 Ill.App.3d 785, 218 Ill.Dec. 263, 668 N.E.2d 1095, 1100 (1996) ("Self-defense is an affirmative defense, and unless the State's evidence raises the issue, the defendant must present some evidence as to each of the elements of the defense."); *State v. Bowman*, 869 S.W.2d 901, 903 (Mo. Ct. App. 1994) ("A defendant bears the burden of injecting the issue of self-defense into the case by substantial evidence."); *State v. Janes*, 121 Wash.2d 220, 850 P.2d 495, 504 (1993) ("In order to raise self-defense before the jury, a defendant bears the initial burden of producing some evidence which tends to prove that the killing occurred in circumstances amounting to self-defense.").

[¶15] While this Court has not stated what quantity of evidence is necessary to satisfy the "minimal" or "slight burden" required to make a prima facie showing of self-defense, we are satisfied that burden was not met here. Even when the evidence is viewed in the light most favorable to Mr. Johns, the jury could not have had a reasonable doubt about whether Mr. Johns acted in self-defense. *See United States v. Barrett*, 797 F.3d 1207, 1217 (10th Cir. 2015). The most problematic aspect of Mr. Johns' claim of self-defense is that the jury was presented with no evidence indicating how the incident started or progressed other than the physical evidence and Mr. Johns' statements. The State did present Fady Osseiran's testimony about statements Mr. Johns had made about the killing but, as described in detail below, those statements did not support a self-defense theory. Therefore, there was nothing the jury could rely on to determine whether each element of self-defense could be satis-

fied, a necessary prerequisite to trigger the State's obligation to rebut those facts beyond a reasonable doubt. *Brown*, ¶ 16, 332 P.3d at 1174.

[¶16] Mr. Johns argues that there was no evidence presented at trial that suggested he was the aggressor in the conflict that led to Mr. Wickersham's death. Further, he states that the evidence established that Mr. Wickersham was the aggressor because he was "brandishing knives" and making threatening gestures. He also asserts that Mr. Osseiran stated that Mr. Johns received a defensive wound on his hand while "trying to protect himself." Mr. Johns' assertions are a mischaracterization of the record.

[¶17] During the cross-examination of many of the State's witnesses, Mr. Johns' counsel attempted to elicit testimony that Mr. Wickersham was acting aggressively when he was showing the partygoers his knives and swords. There was some testimony that Mr. Johns and Mr. Wickersham had argued about the music and Mr. Johns' rent, and that Mr. Wickersham "postured" toward Mr. Johns while holding the knives. However, the witness who mentioned "posturing" made it clear that Mr. Wickersham was at least twenty feet away from Mr. Johns and that he did not consider Mr. Wickersham a threat at any time during the evening. The overall tenor of all of the witnesses' testimony demonstrated that Mr. Johns was exhibiting drunken and "belligerent" behavior and that Mr. Wickersham was not acting aggressively even when showing his knives and swords. Additionally, the "posturing" and any verbal disagreements between Mr. Johns and Mr. Wickersham stemmed from Mr. Johns' belligerent and drunken behavior, not Mr. Wickersham's actions. Most importantly, none of the witnesses observed a physical altercation of any kind between Mr. Johns and Mr. Wickersham.

[¶18] Further, despite Mr. Johns' argument to the contrary, Mr. Osseiran's testimony does not support Mr. Johns' self-defense theory. Mr. Osseiran shared a jail cell with Mr. Johns and testified that Mr. Johns relayed the following about the events that led to Mr. Wickersham's death:

Q. (BY [PROSECUTOR]) Mr. Osseiran, we were talking about how the defendant was armed. Did he tell you what type of weapon he had?

A. It's—I believe it was a green knife.

Q. All right.

A. Yeah, that's what it was told to me.

Q. All right. How did he describe the other person involved in this?

A. Well, they—they had an argument, you know, on the house 'cause the defendant was—he came in and he was high. And the defendant looked at the other guy, the victim was trying to protect himself because he was trying to tell him to get out. And when he saw the knife, he went and armed himself, also, with the sword.

. . . .

Q. All right. Did he tell you how he got the cut on his finger by chance?

A. Yeah. When he—the victim—the victim was trying to defend himself, and he was trying to grab it from the victim, and he cut himself right here. Just when he disarmed the victim with it.

. . . .

Q. ([BY PROSECUTOR]) Did he tell you which weapon he used the most?

A. Well, he used a knife first to stab him a lot, like quite a few times. But mostly the knife, not the sword.

Q. Did he tell you if he used the sword at all?

A. He didn't get to that much detail with it but, mostly, the knife. He was just trying to protect himself, I guess, after he discharged the victim.

Q. All right. And what happened after the victim—his name was Mr. Wickersham—when he wasn't moving anymore?

A. Well, he was—he was just sitting there. He was—I guess he was dead, like you said. And then he went in the bathroom, run some water on the sword, came back, and it [sic] was twitching. So he finished stabbing him to make sure he was—had no more brain cells or anything moving after that. I don't know what happened after that. I don't know.

Without providing a citation, Mr. Johns quotes Mr. Osseiran's testimony to support Mr. Johns' position that he was "just trying to protect himself." Mr. Osseiran's use of pronouns does render selected parts of his testimony somewhat garbled, but his testimony as a whole makes it clear that Mr. Wickersham armed himself with the sword to defend himself from a knife attack from Mr. Johns. His testimony is also clear that Mr. Johns continued to stab Mr. Wickersham after he was clearly incapacitated in order to ensure he was dead.

[¶19] Based upon the evidence that was and was not presented at trial, it is clear that Mr. Johns' theory of self-defense was premised on a lack of information about what happened at the time of Mr. Wickersham's death and, therefore, it is as likely that Mr. Johns was acting in self-defense as it was that he was not. While that may be true, it does not change the fact there is no evidence that: 1) Mr. Wichersham was the aggressor in this conflict; 2) Mr. Johns believed he was in immediate danger of death or serious bodily injury; 3) Mr. Johns' belief was reasonable; and 4) and there was no other reasonable method of resolving the conflict. The only way the jury could have concluded that Mr. Johns was acting in self-defense when he killed Mr. Wickersham would have been through inappropriate speculation and conjecture. *See Bruce v. State*, 2015 WY 46, ¶ 85, 346 P.3d 909, 934 (Wyo. 2015) ("The self-defense instruction requested by Mr. Bruce would have simply been an invitation to the jury to engage in speculation or conjecture, and the district court thus properly refused to give the instruction."); *see also State v. Graham*, 371 N.W.2d 204, 209 (Minn. 1985) ("The defense's argument for the instruction is that, since the evidence was circumstantial, there is no way of telling who fired first; therefore, it could have been Russell as well as it could have been Graham. The argument is not supported with any evidence and is not even a rebuttal to the state's evidence that Graham was the aggressor. Thus, the defense failed in its burden to go forward with evidence of an independent assault by Officer Russell, and the trial court's refusal to give the instruction was proper.") Therefore, Mr. Johns failed to make a prima facie showing that required the district court to instruct the jury regarding the law of self-defense. Any errors or confusion that may have existed in the instructions could not have prejudiced Mr. Johns, and he has failed to demonstrate plain error.

***Burden of Proof for Sudden Heat of Passion***

■ [¶20] Mr. Johns argues the district court improperly instructed the jury regarding the State's burden of proof for the lesser offense of voluntary manslaughter. The district court gave the following instruction from the Wyoming Pattern Jury Instructions:

Instruction No. 27

YOU ARE INSTRUCTED that the elements of the lesser included crime of Voluntary Manslaughter are:

1. On or about the 29th day of August, 2015, through on or about the 30th day of August, 2015;

2. In Natrona County, Wyoming;

3. The Defendant, Don Wesley Johns;

4. Voluntarily;

5. Upon a sudden heat of passion;

6. Killed a human being, namely: Don Wickersham.

If you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt, then you should find the Defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any of these elements has not been proved beyond a reasonable doubt, then you should find the Defendant not guilty.

In *Shull v. State*, 2017 WY 14, ¶ 39, 388 P.3d 763, 772 (Wyo. 2017), we held this instruction was inappropriate as a lesser included offense instruction because it did not inform the jury that the State was required to disprove a sudden heat of passion. We further held that this error was structural in nature and required reversal regardless of the prejudicial effect of the error. *Id.*, ¶ 45, 388 P.3d at 774.

[¶21] However, we recently revisited our decision in *Shull* and overruled our conclusion that use of this instruction in a lesser offense context amounts to structural error. *Schmuck*, ¶ 31, 406 P.3d at 297. Instead, it amounts to trial error, which requires a defendant to demonstrate plain error—including the prejudicial natural of the error—if he failed to object to the instruction at trial. *Id.*, ¶ 32, 406 P.3d at 297. Mr. Johns acknowledges that his counsel did not object to this instruction at trial; therefore, we review this claim for plain error.

[¶22] The record clearly reflects the district court gave the jury the pattern instruction regarding voluntary manslaughter, satisfying the first part of the plain error standard of review. While *Shull* established a clear and unequivocal rule of law regarding the use of the instruction in a situation such as this, that rule of law was not established until approximately two and a half months after Mr. Johns' trial had concluded. Wyoming law is unsettled as to whether a law must be clear and unequivocal at the time of trial in order to satisfy plain error review. *Schmuck*, ¶ 34, 406 P.3d at 298. That question need not be answered here because Mr. Johns cannot establish prejudice.

[¶23] The record is clear that Mr. Johns did not attempt to mitigate the malice element of first- or second-degree murder by arguing he killed Mr. Wickersham in a sudden heat of passion. He did not propose a jury instruction regarding voluntary manslaughter, and he did not include voluntary manslaughter on his proposed verdict form. Further, he did not point to any evidence presented at trial that would have shown he acted in a sudden heat of passion. Instead, his sole argument was that he killed Mr. Wickersham while defending himself. Additionally, there was no evidence presented at trial that would have supported a conclusion that Mr. Johns acted under a sudden heat of passion. As stated above, while there was evidence of Mr. Johns' and Mr. Wickersham's behavior earlier in the evening, there was absolutely no evidence about what transpired at the time of Mr. Wickersham's death that would have demonstrated Mr. Johns

acted in a sudden heat of passion. Further, Mr. Johns' statements to Mr. Osseiran do not suggest he acted in a sudden heat of passion. Therefore, it would have been well within the district court's discretion to not give a voluntary manslaughter instruction. *See Dean v. State*, 2003 WY 128, ¶ 19, 77 P.3d 692, 699 (Wyo. 2003) (a lesser-included offense instruction should not be given in the absence of some minimal evidentiary support). Consequently, an instruction regarding voluntary manslaughter and sudden heat of passion that complied with *Shull* would not have changed the verdict, and Mr. Johns has failed to demonstrate plain error. *Schmuck*, ¶ 37, 406 P.3d at 299.

### Stepped Verdict Form

[¶24] Mr. Johns argues that the verdict form the district court submitted to the jury did not allow the jury to appropriately consider whether Mr. Johns' actions were the result of a sudden heat of passion that would have led to a conviction of voluntary manslaughter instead of first- or second-degree murder. The verdict form used here was a stepped verdict form, wherein the jury was instructed to consider the first-degree murder charge, and only if it found the defendant not guilty of that charge should the jury deliberate about second-degree murder, and then voluntary manslaughter. Mr. Johns did not object to the use of this verdict form, therefore, we again review his claim for plain error.

[¶25] We are unpersuaded by Mr. Johns' argument regarding the verdict form for the same reasons he could not demonstrate plain error in the voluntary manslaughter jury instruction. Mr. Johns did not argue he acted in a sudden heat of passion, and no evidence was presented by either party that would have allowed the jury to reach that conclusion. Thus, even if the district court had submitted a verdict form that met Mr. Johns' satisfaction (which he does not suggest what that verdict form would look like), the jury's verdict would have remained the same and Mr. Johns has failed to establish prejudice.

### Definition of Recklessly in the Malice Element of Second-Degree Murder

[¶26] The district court instructed the jury that second-degree murder is a lesser

included offense of first-degree murder and, consequently, instructed the jury regarding the elements of second-degree murder. Based upon this Court's decision in *Wilkerson v. State*, 2014 WY 136, 336 P.3d 1188 (Wyo. 2014), the district court gave the jury further instruction regarding the definition of "malice" found in the second-degree murder statute:

Instruction No. 24

YOU ARE INSTRUCTED that for purposes of considering the lesser-included offense of Murder in the Second Degree, the following definitions apply:

The term "Malice" means that the act constituting the offense was done recklessly under circumstances manifesting an extreme indifference to the value of human life, and that the act was done without legal justification or excuse.

The term "maliciously" means that the act constituting the offense was done intentionally but without premeditation, was reasonably likely to result in death, was done without legal justification or excuse or recklessly under circumstances manifesting an extreme indifference to the value of human life, and was done without legal justification or excuse.

[¶27] Mr. Johns argues that the district court should have given further definition of the term "recklessly" as used in the definition of malice. Mr. Johns did not object to Instruction No. 24 and he never suggested that the jury be given a definition of "recklessly." Therefore, our review on appeal is limited to one for plain error. Once again, Mr. Johns is unable to demonstrate he suffered any prejudice in this instance.

[¶28] As discussed above, the jury used a stepped verdict form during its deliberations. Thus, the jury deliberated first about Mr. Johns' guilt on the first-degree murder charge, and only if it determined he was not guilty of that charge would the jury have considered whether he was guilty of second-degree murder. The jury found that Mr. Johns was guilty of first-degree murder; therefore, the instructions regarding the elements of second-degree murder and any definitions of those elements were not considered by the jury. Any further definition of the term "recklessly" would not have made a difference in the verdict, and Mr. Johns cannot demonstrate he suffered prejudice. *Hawes*, ¶ 19, 335 P.3d at 1078-79 (2014).

## CONCLUSION

[¶29] Mr. Johns has failed to demonstrate he suffered material prejudice from any of the jury instructions he claims were given in error or from the verdict form. Thus, he has failed to carry his burden of demonstrating plain error.

[¶30] Affirmed.