KAUTZ, Justice.
[¶1] A jury convicted Todd M. Sindelar of second-degree murder for shooting and killing Matthew Boyer. Mr. Sindelar asserts the district court committed several errors in instructing the jury. We conclude that, although some of the instructions were incorrect, Mr. Sindelar was not prejudiced by the errors and, accordingly, affirm.
ISSUES
[¶2] The issues on appeal are:
I. Did the district court commit plain error when it failed to properly instruct the jury on self-defense and the duty to retreat?
II. Did the district court commit plain error when it instructed the jury on second-degree murder?
*766 a. Did the district court include an incorrect definition of "maliciously" in the jury instructions?
b. Did the district court err by failing to define "recklessly" or "recklessly under circumstances manifesting an extreme indifference to the value of human life" in the jury instructions?
III. Did the district court commit plain error[1] by failing to instruct the jury that the State had to prove beyond a reasonable doubt that Mr. Sindelar did not act in a sudden heat of passion and by using a stepped verdict form that did not allow the jury to consider the defense of voluntary manslaughter?
FACTS
[¶3] Mr. Sindelar and Mr. Boyer had once been close friends but they had a falling out some time prior to the event in question. Mr. Boyer was also friends with Lyle Schmidt, who had rented a room from Mr. Sindelar for a time. On the night of November 27, 2013, Mr. Schmidt and Mr. Boyer were drinking together. They discussed that Mr. Schmidt had given Mr. Sindelar "400-some-dollars" for rent but subsequently discovered that a former tenant had also paid rent for the room for the same time period. Although Mr. Schmidt had since moved out, he was upset about the rent and decided to go to Mr. Sindelar's place and confront him about it.
[¶4] Mr. Sindelar was not at home when Mr. Schmidt and Mr. Boyer arrived at his house, but another resident of the house, Jonathan Whelan, was. Mr. Whelan stated that the two visitors were "aggressively upset," and Mr. Schmidt asked Mr. Whelan to call Mr. Sindelar. Mr. Whelan made the call and gave Mr. Schmidt the phone. Mr. Schmidt asked Mr. Sindelar where he was. Mr. Sindelar said he was at Mingles, even though he was actually at Boot Hill. Mr. Sindelar described Mr. Schmidt as "very angry," but Mr. Schmidt did not threaten him or Mr. Whelan. Mr. Boyer did not speak at all.
[¶5] Mr. Schmidt and Mr. Boyer went to Mingles looking for Mr. Sindelar. Mr. Schmidt stated that they intended to talk to Mr. Sindelar about the rent dispute. They did not locate Mr. Sindelar, so they went back to his house. No one answered the door at Mr. Sindelar's house, but Mr. Schmidt testified that he and Mr. Boyer went in to see if they could find anyone. He went up to the bedrooms on the second floor but did not locate anyone. He testified that, as they were leaving, he tripped over the coffee table and grabbed the entertainment center to catch himself, accidentally knocking it over. The entertainment center and the TV fell onto the coffee table, breaking the table. Mr. Schmidt denied breaking the door or a mirror downstairs.
[¶6] Mr. Whelan testified that he had gone looking for Mr. Sindelar at Boot Hill after Mr. Schmidt and Mr. Boyer left the house the first time. The bar was already closed when he got there and he did not find Mr. Sindelar, so he returned to the house. According to Mr. Whelan, he found the door to the house broken, the entertainment center knocked over, and a mirror in a downstairs bedroom broken on the floor.
[¶7] Mr. Whelan called Mr. Sindelar to report that the house had been broken into, the entertainment center was knocked over, and the coffee table and a mirror were broken. Mr. Sindelar and a friend had been to Mingles looking for Mr. Schmidt and Mr. Boyer and were headed back to the friend's house when Mr. Whelan called. Mr. Sindelar instructed Mr. Whelan not to call the police and said he would "take care of it." Mr. Sindelar tried to get his friend to take him to *767 his car, which was parked at another friend's house, but she refused, fearing he would get into trouble. So, Mr. Sindelar called Mr. Whelan and asked him for a ride to his car. Mr. Whelan took Mr. Sindelar home to get the keys and then to his car. Mr. Sindelar gave him $20 for his trouble. Mr. Sindelar drove to McDonalds, bought a sandwich and ate it in his car. There is a dispute over the details; however, it is clear that after finishing his meal, Mr. Sindelar drove to Mr. Boyer's house around 3:30 a.m. and shot him.
[¶8] Mr. Boyer's girlfriend, Jessica Hanten, testified that she and Mr. Boyer were asleep in their second-floor bedroom when she heard pounding on the door, which she described as louder than a knock. Mr. Boyer woke up and went downstairs, wearing only a pair of athletic shorts. Ms. Hanten heard him going down the stairs and heard the front door open with no gap between the two sounds. She heard Mr. Boyer say, "What the f***?", followed immediately by two gunshots. She did not hear any discussion between Mr. Boyer and Mr. Sindelar. Ms. Hanten ran downstairs and found Mr. Boyer on the floor with his whole body inside the house. There was no knife or other weapon anywhere near him. She shouted for help from a roommate who lived in the basement, Jacob Rogers, and called 911. The 911 operator asked her to look for weapons, and she told the operator she did not see any.
[¶9] Mr. Rogers testified that in the early morning hours of November 28, 2013, he heard loud banging on the front door. He heard "someone running down the stairs, and then opening the door, and then I heard two bangs," which he said sounded like bricks being clapped together. He described the timing of the sounds as follows:
Q. Now, when you hear the banging on the door to the coming down the stairs to the door opening, was there any break in time between you hearing the coming down the stairs and the opening of the door?
A. Like two seconds, maybe split seconds; not long at all.
Q. So it wasn't as though you hear someone coming down the stairs, then there's a pause for ten minutes, and then all of a sudden you hear the door open?
A. o, it was all in one concurring motion, like it all happened all at once.
Q. So in succession?
A. In succession, yes. It happened someone going down the stairs, opening the door, and then two gunshots, and it all happened all altogether.
[¶10] Mr. Rogers testified that, because of all the noise, he had already started up the stairs from the basement when Ms. Hanten screamed for him. He saw Mr. Boyer lying on his back on the floor with his feet pointed toward the door. No portion of Mr. Boyer's body was outside of the residence. He saw "little bits" of blood on Mr. Boyer's chest and stomach and picked him up and saw two exit wounds in his back, with blood pooling on the floor beneath him. He overheard Ms. Hanten talking to the 911 operator and she mentioned CPR, so he tried to perform CPR "for a minute," but stopped because he did not know how to do it. He denied seeing any weapons or "knives of any sort" by Mr. Boyer and denied removing any knives or other weapons from Mr. Boyer's presence.
[¶11] Mr. Sindelar told a different story. He claimed that he drove to Mr. Boyer's house at around 3:30 a.m. to "talk" to him. He parked across the street from the house, tucked the gun that he kept under his car seat into the waistband of his pants, walked to the house and up onto the front porch, opened the storm door and knocked. He said that no one responded to his first knock, so he knocked louder. Mr. Sindelar stated that he saw someone look out through the blinds on the window to the side of the door and a period of time went by before Mr. Boyer opened the door. Mr. Sindelar testified that Mr. Boyer said, "What the f*** are you doing here?" According to Mr. Sindelar, he responded, "Why did you break into my house?" He said he then noticed a knife in Mr. Boyer's hand.[2] Mr. Sindelar stated there was about three feet between him and Mr. *768 Boyer at that time-Mr. Boyer was less than one foot inside the door and he was two feet outside the door. Mr. Sindelar said that he pulled the gun out of his waistband, held it at his side and said, "Don't come at me with a knife. I have a gun." Mr. Sindelar said that Mr. Boyer lunged at him with the knife, he pulled the gun up and shot once, took a step back and then shot Mr. Boyer a second time. He stated that Mr. Boyer said something like, "Aw f*** call the," and the door shut. He heard the knife hit the floor when Mr. Boyer fell.
[¶12] After the shooting, Mr. Sindelar drove east on I-90. He called his ex-girlfriend and, about ten to fifteen miles outside of Gillette, threw the phone out the window so he could not be tracked. He stopped in the Black Hills near Sundance, Wyoming, to sleep. In the morning, he drove into Rapid City, South Dakota, and purchased gas.
[¶13] Near Rapid City, a South Dakota highway patrolman recognized Mr. Sindelar's car from a BOLO (Be On the Look Out) notice. After requesting assistance from other troopers, he attempted to stop Mr. Sindelar. Mr. Sindelar led South Dakota authorities on a high-speed chase. He eventually was taken into custody when a set of spikes punctured his tire. Mr. Sindelar stated that he planned to go to a large city, steal a car, and drive to Florida.
[¶14] The State charged Mr. Sindelar with first-degree murder. He was tried in 2015, and the jury acquitted him of first-degree murder but convicted him of the lesser charge, second-degree murder. He appealed his conviction, and the State conceded error because the district court had improperly given the jury a "flight" instruction, in contravention of Hadden v. State , 2002 WY 41, 42 P.3d 495 (Wyo. 2002). We entered an order reversing and remanding the case for further proceedings. Sindelar v. State , 2016 WY 88, 378 P.3d 309 (Wyo. 2016).
[¶15] The State filed an amended information, charging Mr. Sindelar with second-degree murder.[3] The matter was tried before a jury in January 2017. Mr. Sindelar admitted that he shot and killed Mr. Boyer, but claimed that he was acting in self-defense. The jury convicted him of second-degree murder, and he filed a timely notice of appeal.
STANDARD OF REVIEW
[¶16] Mr. Sindelar claims the district court gave several erroneous instructions to the jury. He did not object to any of the instructions; consequently, our review is limited to a search for plain error. In order to establish the district court committed plain error, Mr. Sindelar is required to show: 1) the record is clear about the incident alleged as error; 2) the district court transgressed a clear and unequivocal rule of law; and 3) he was denied a substantial right resulting in material prejudice. Johns v. State , 2018 WY 16, ¶ 12, 409 P.3d 1260, 1264 (Wyo. 2018) (citing Schmuck v. State , 2017 WY 140, ¶ 32, 406 P.3d 286, 297 (Wyo. 2017) and Collins v. State , 2015 WY 92, ¶ 10, 354 P.3d 55, 57 (Wyo. 2015) ).
DISCUSSION
I. Self-Defense
[¶17] Mr. Sindelar claims the district court committed plain error when it instructed the jury that he had an absolute duty to retreat before using deadly force. The district court gave the following instructions regarding self-defense and the duty to retreat:
INSTRUCTION NO. 21
If the Defendant had reasonable grounds to believe and did believe that he was in imminent danger of death or serious bodily harm from which the Defendant could save himself only by using deadly force against an assailant, the Defendant had the right to use deadly force in order to defend himself. "Deadly force" means force which is likely to cause death or serious bodily harm.
*769 The circumstances under which the Defendant acted must have been such as to produce in the mind of a reasonably prudent person, similarly situated, the reasonable belief that the assailant was about to kill the Defendant or do serious bodily harm to the Defendant. The danger must have been apparent, present and imminent or must have appeared to be so under the circumstances.
If the Defendant believed that he was in imminent danger of death or serious bodily harm, and that deadly force was necessary to repel such danger, and if a reasonable person in a similar situation seeing and knowing the same facts would be justified in believing that he was in similar danger, the Defendant would be justified in using deadly force in self-defense. The Defendant would be justified even though the appearance of danger later proved to be false and there was actually neither purpose on the part of the other person to kill the Defendant or do the Defendant serious bodily harm nor imminent danger that it would be done, nor actual necessity that deadly force be used in self-defense. If the person so confronted acts in self-defense upon such appearance of danger from honest belief, the right of self-defense is the same whether the danger is real or merely apparent.
INSTRUCTION NO. 22
Generally, the right to use self-defense is not available to one who is the aggressor or provokes the conflict. However, if one who provokes a conflict thereafter withdraws from it in good faith and informs his adversary by words or actions that he wants to end the conflict, and he is thereafter pursued or attacked, he then has the same right of self-defense as any other person.
INSTRUCTION NO. 23
A person has the right to go anywhere that is lawful for him to go and to arm himself if it is otherwise legal to do so. He will not be viewed as the aggressor for simply asserting those rights. If, however, he is the aggressor in a conflict, he must retreat or withdraw from the conflict before his later actions will be justified by self-defense.
Some sort of physical aggression or a threat of imminent use of deadly force is required before a person will be considered an aggressor.
INSTRUCTION NO. 24
One who has reasonable grounds to believe that another will attack him, and that the anticipated attack will be of such a character as to endanger his life or limb, or to cause him serious bodily harm, has a right to arm himself for the purpose of resisting such attack.
If the Defendant armed himself in reasonable anticipation of such an attack, that fact alone does not make the Defendant the aggressor or deprive the Defendant of the right of self-defense.
INSTRUCTION NO. 25
Even if the Defendant had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, the Defendant was justified in using deadly force to repel the danger only if he retreated as far as he safely could do before using deadly force. The law requires a person to retreat rather than to take the life of an adversary if there was a convenient mode of retreat without increasing his actual or apparent peril. To excuse a failure to retreat, it is necessary that the Defendant's peril would be increased, or that it reasonably appeared that it would be increased, by retreat. If you find that the Defendant could have safely retreated but failed to do so, the Defendant cannot rely on the justification of self-defense.
[¶18] Mr. Sindelar asserts that Instruction No. 25 was incorrect because it imposed an absolute duty to retreat regardless of who provoked the conflict. The challenged instruction is shown in the record, satisfying the first part of the plain error test. Turning to the second part of the test-violation of a clear and unequivocal rule of law-we note that the instruction given in this case is the exact instruction this Court disapproved of in Drennen v. State , 2013 WY 118, ¶¶ 37-39, 311 P.3d 116, 129-30 (Wyo. 2013). See also , *770 Haire v. State , 2017 WY 48, ¶ 34, 393 P.3d 1304, 1313 (Wyo. 2017). We explained the problem with the instruction in Drennen as follows:
Keeping in mind the rule that one can use deadly force in self-defense only if he has reasonable grounds to believe it is necessary to avoid death or serious bodily harm, the law has recognized that a person has a duty to pursue reasonable alternatives prior to using deadly force. One of those reasonable alternatives may be the duty to retreat. In other words, it is not necessary for a person to resort to deadly force if there are other reasonable alternatives available to him, one of which may be to retreat. This does not impose an absolute duty of retreat; it only requires that a person avoid using deadly force against another if there is a reasonable alternative available to him.
Drennen , ¶ 36, 311 P.3d at 128-29 (citations omitted).
[¶19] The jury in Mr. Sindelar's case should have been instructed that a defendant is justified in using deadly force only if necessary and must consider reasonable alternatives, which may include retreat, before using deadly force. Haire , ¶ 37, 393 P.3d at 1314. The district court did not instruct the jury in accordance with Drennen , which was decided several years before Mr. Sindelar's trial. Consequently, Mr. Sindelar has shown that the district court violated a clear and unequivocal rule of law.
[¶20] We turn, then, to the third prong of the plain error analysis-whether Mr. Sindelar was "denied a substantial right resulting in material prejudice." Johns , ¶ 12, 409 P.3d at 1264. The burden of showing material prejudice rests upon the appellant. Pendleton v. State , 2008 WY 36, ¶ 11, 180 P.3d 212, 216 (Wyo. 2008). "To establish prejudice, the appellant must show a reasonable probability that [he] would have received a more favorable verdict in the absence of the error." Id. (citing Miller v. State , 2006 WY 17, ¶ 15, 127 P.3d 793, 798 (Wyo. 2006) ). See also , Snow v. State , 2009 WY 117, ¶ 34, 216 P.3d 505, 516-17 (Wyo. 2009).
[¶21] Relying on Haire , Mr. Sindelar claims the instruction prejudiced him because the prosecutor argued that Mr. Sindelar had an absolute duty to retreat. In particular, the prosecutor said:
Mr. Sindelar, before he can be seen or be given that self-defense[,] he must retreat or withdraw. Does he retreat or withdraw? Remember the picture of the front of the house. Right behind where Mr. Sindelar would be standing holding open the door, is a way for him to retreat, and he does not do so. Instead of even trying to retreat, he shoots Matthew Boyer in the chest twice. ...
Even if, ladies and gentleman of the jury, you believe that there was a knife, and you believe that Mr. Boyer lunged at Mr. Sindelar, before Mr. Sindelar can use the justification of self-defense he's got to attempt to retreat, just walk off the porch. Again, Mr. Boyer never left his home. If Mr. Sindelar walks off the porch, that's an effective retreat. He didn't have to shoot Matthew Boyer .... He chose to shoot Matthew Boyer. ....
[¶22] It is true, as we stated above, that the jury should not have been instructed that Mr. Sindelar had an absolute duty to retreat if he was not the aggressor. The pivotal question for any claim of self-defense is whether the killing was necessary. Thus, the jury should have been instructed that the defendant "must consider reasonable alternatives prior to using deadly force, one of which may be the duty to retreat or 'escape,' " Drennen , ¶ 28, 311 P.3d at 126, and the prosecutor should have conformed his argument to the correct law. However, under the facts of this case, retreat was the only reasonable alternative to shooting Mr. Boyer suggested by the facts or the parties' arguments. Mr. Sindelar was holding a loaded handgun which, obviously, had a much greater range than the knife with which Mr. Boyer allegedly lunged at him. Mr. Sindelar was standing on the porch holding the storm door open with his body. He could have simply stepped back and let the door close to get away from the knife. See Garcia v. State , 667 P.2d 1148, 1153 (Wyo. 1983) (holding the district court did not err by giving the same instruction challenged in the case at bar because the opportunity to retreat was so obviously available to the appellant).
*771 [¶23] It was not improper for the State to argue that retreat was a reasonable alternative available to Mr. Sindelar. Indeed, that argument pertained to the State's burden to show that it was unnecessary for Mr. Sindelar to shoot and kill Mr. Boyer. The only problem with the instruction or with the prosecutor's argument is that it focused only upon retreat as an alternative to the use of deadly force and did not inform the jury that other reasonable options had to be considered in determining whether shooting Mr. Boyer was necessary.
[¶24] Mr. Sindelar claims this case is analogous to Haire . We reversed Mr. Haire's conviction for involuntary manslaughter because the jury was incorrectly instructed on self-defense. Although the jury instruction problem in this case is the same as the one addressed in Haire , the facts are different. In Haire , the decedent shot first and there was a great deal of evidence about whether it would have been reasonable for Mr. Haire to retreat or whether there were other alternatives to killing the decedent available to him. The evidence showed that, after the decedent fired the first round, Mr. Haire could have sought refuge in his mobile home. In fact, he "ushered" his wife and a friend into the home after the decedent first shot at them but did not stay there. Mr. Haire testified that he did not go into the mobile home because the walls were thin and "would likely not have repelled a round from a powerful handgun" like the decedent's. He also testified about another possible alternative to shooting the decedent-calling 911. He said that was not a reasonable option because it would have taken law enforcement too long to get there. Haire , ¶¶ 8-9, 41, 393 P.3d at 1307, 1314. The prosecutor repeatedly emphasized the incorrect instruction which required Mr. Haire to retreat. Id. , ¶¶ 41-43, 393 P.3d at 1314-16. Thus, there was "a reasonable probability that, without the erroneous instruction, the jury could have reached a verdict more favorable" to Mr. Haire. Id. , ¶ 44, 393 P.3d at 1316. Given there was no evidence or argument about reasonable alternatives other than retreat available to Mr. Sindelar when he shot Mr. Boyer and the evidence clearly showed he could have stepped back to avoid being stabbed, it is a much closer question as to whether he has demonstrated that he was prejudiced by the incorrect instruction.
[¶25] However, it is unnecessary for us to decide this case on that basis because there is another reason Mr. Sindelar was not prejudiced by the instruction-the evidence was overwhelming that he was the aggressor in the conflict. As Jury Instruction No. 22 correctly informed the jury, if the defendant was the aggressor, he was required to withdraw or retreat from the conflict before he had the right of self-defense. Drennen , ¶ 26, 311 P.3d at 126 ; Garcia , 667 P.2d at 1150-53. Thus, if Mr. Sindelar was the aggressor, any error in Instruction No. 25 is harmless because he did have an absolute duty to retreat. See Schmuck , ¶ 71, 406 P.3d at 309.
[¶26] In Drennen , ¶ 34, 311 P.3d at 128, we said that "some sort of physical aggression or a threat of imminent use of deadly force is required before a person will be considered an aggressor." Mr. Sindelar's theory was that Mr. Boyer parted the blinds and looked out the window, saw Mr. Sindelar at the door, and then went to the kitchen and got a knife from the knife block on the counter. According to Mr. Sindelar, after securing the knife, Mr. Boyer went back to the door and opened it. Mr. Sindelar asked why Mr. Boyer had broken into his house and then saw Mr. Boyer was holding a knife. He warned that he had a gun so Mr. Boyer should not "come at" him with the knife. Despite the warning, Mr. Boyer lunged at him, and he had no choice but to shoot Mr. Boyer in self-defense. He claims that Mr. Rogers "sanitized" the scene by picking the knife up and placing it under the dishcloth in the sink.
[¶27] Mr. Sindelar's theory is not corroborated by any of the physical evidence or the other witnesses' testimony. Ms. Hanten testified that she heard Mr. Boyer go down the stairs, open the door and exclaim, "What the f***?", followed immediately by two gunshots. Ms. Hanten and Mr. Rogers both testified there was no pause between the sounds of Mr. Boyer going downstairs and the door opening. Their testimony specifically refutes Mr. Sindelar's claim that Mr. Boyer went into the kitchen to get a knife before answering the door.
*772 [¶28] Mr. Sindelar testified that, after Mr. Boyer opened the door, they had a verbal exchange in which he asked Mr. Boyer why he had broken into his house and then saw the knife in Mr. Boyer's hand. He said he warned Mr. Boyer not to come at him with the knife because he had a gun. Ms. Hanten denied hearing any verbal exchange between Mr. Sindelar and Mr. Boyer and stated that she heard only Mr. Boyer's exclamation.
[¶29] The State specifically impeached Mr. Sindelar's trial testimony with regard to when he saw the knife. As we have said, Mr. Sindelar claimed to have seen the knife when he was questioning Mr. Boyer about breaking into his house. On cross-examination, the State elicited the following testimony from Mr. Sindelar:
Q. Okay. And while you were testifying-and again, sir, I want to make sure that I have this right. Did you indicate that you didn't notice the knife at first?
A. No, not at first, no.
Q. Okay. Do you remember testifying prior to this?
A. Yes, sir.
....
Q. I'm going to hand you a transcript. I'm going to ask you, sir, to flip to page 208, if you would. Can I get you to just look at that page for me?
A. Yes, sir.
Q. Do you recognize being asked these questions, sir?
A. Yes, sir.
Q. And on line 17 the question was asked, "And when Matt opened the door, what was the first thing you saw?"; is that correct?
A. Yes, sir.
Q. And your answer on line 19, "I saw the knife in his right hand."
A. Yes, sir.
The evidence about when Mr. Sindelar saw the knife and what he did in response was critical to the question of whether it was necessary to kill Mr. Boyer. Mr. Sindelar's inconsistent testimony undermines any assertion that Mr. Boyer was the aggressor.
[¶30] In fact, the evidence did not support Mr. Sindelar's claim that Mr. Boyer had a knife at all. Mr. Sindelar asserted that Mr. Rogers had blood on his hands from performing CPR on Mr. Boyer, so he picked the knife up and took it to the kitchen sink where he washed his hands and placed the knife in the sink with a dishcloth hiding it. In support of this theory, Mr. Sindelar introduced some photographs taken by the investigating officers. One of them showed a knife block in the kitchen containing knives with black handles. One of the smaller knives was missing from the block. Two other photos showed a sink full of dirty dishes with a dishcloth on top of them. Sticking out from under the dishcloth was a small part of something black, although the identity of the item is unclear.
[¶31] Mr. Sindelar's argument about the knife is untenable. Ms. Hanten and Mr. Rogers both said there was no knife in the vicinity of Mr. Boyer's body. The 911 operator specifically asked Ms. Hanten to look for any weapons and she denied there were any. No one asked Mr. Rogers if he had blood on his hands or if he had washed them. The knife which was missing from the block was small, raising the question of why, if Mr. Boyer was procuring a knife to protect himself, he would not have chosen one of the much larger knives. Furthermore, it is not even clear that there was a knife in the sink. The photographs show only that there was something black under the dishcloth. If the knife was in the sink, it was simply one of many dirty dishes stacked in the sink and on the counters.
[¶32] The position and condition of Mr. Boyer's body also countered Mr. Sindelar's theory of defense. He fell inside the front door of the house. No part of him was outside of the house. Mr. Sindelar testified that when Mr. Boyer opened the door, Mr. Boyer was "less than a foot from the doorway" and Mr. Sindelar was standing approximately two feet back from the threshold, holding the storm door open with his body. Given these distances, if Mr. Boyer had lunged at Mr. Sindelar with the knife, he would have crossed the threshold. Yet, when he fell after being shot, he was still within the house. In *773 fact, Mr. Sindelar admitted that Mr. Boyer was never outside.
[¶33] Additionally, Donald Habbe, M.D., the forensic pathologist who conducted the autopsy on Mr. Boyer's body, testified that, if a shooter is in close proximity to the victim, gunshot residue will be deposited on the victim. If there is no such residue, the wound is classified as a "distant wound." There was no gunshot residue on Mr. Boyer's body, so both wounds were classified as "distant wounds." Mr. Sindelar testified that the men were separated by three feet when Mr. Boyer answered the door. If Mr. Boyer lunged at him with the knife as Mr. Sindelar claimed, the gap between the men would have decreased, bringing them in close proximity to one another, making it likely gunshot residue would have been deposited on the body. Therefore, the forensic pathology evidence also refutes Mr. Sindelar's version of the events.
[¶34] On this record, there is no reasonable probability that the jury would have found Mr. Boyer was the aggressor. Given Mr. Sindelar was the aggressor, he had an absolute duty to retreat before using deadly force. The district court's error in instructing the jury that he had the duty to retreat was harmless.
II. Second-Degree Murder Mens Rea
[¶35] Mr. Sindelar claims the district court made two errors in instructing the jury on the mens rea element of second-degree murder. First, he argues that the given definition of "maliciously" was inadequate in light of our decision in Wilkerson v. State , 2014 WY 136, 336 P.3d 1188 (Wyo. 2014). His second argument is that the district court erred by not defining the terms "reckless" or "recklessly under circumstances manifesting an extreme indifference to the value of human life" for the jury.
[¶36] The jury instructions stated, in relevant part:
INSTRUCTION NO. 14
The necessary elements of the crime of Murder in the Second Degree, as charged in this case, are:
1. On or about the 28th day of November, 2013;
2. In Campbell County, Wyoming;
3. The Defendant, Todd M. Sindelar;
4. Purposely; and
5. Maliciously;
6. Killed Mathew Boyer.
....
INSTRUCTION NO. 15
"Purposely" means intentionally.
INSTRUCTION NO. 16
The term "malice" means that the act constituting the offense was done recklessly under circumstances manifesting an extreme indifference to the value of human life, and that the act was done without legal justification or excuse.
The term "maliciously" means that the act constituting the offense was done intentionally but without premeditation, was reasonably likely to result in death and was done without legal justification or excuse.
a. Definition of Maliciously
[¶37] Wyo. Stat. Ann. § 6-2-104 (LexisNexis 2017) governs second-degree murder and states, in relevant part: "[W]hoever purposely and maliciously, but without premeditation, kills any human being is guilty of murder in the second degree[.]" In Wilkerson , we determined that our precedent which defined "maliciously" in the second-degree murder statute as requiring only a showing of "hatred, ill will, or hostility or the mere absence of 'legal justification or excuse' " established an improperly low threshold to convict a defendant of second-degree murder and, therefore, did not satisfy the legislature's intent. Wilkerson , ¶ 24, 336 P.3d at 1199 ; Schmuck , ¶ 55, 406 P.3d at 303-04. We held that "the jury must be instructed that 'malice' means that the act constituting the offense was done recklessly under circumstances manifesting an extreme indifference to the value of human life, and that the act was done without legal justification or excuse." Wilkerson , ¶ 27, 336 P.3d at 1200.
[¶38] Mr. Sindelar claims the district court's definition of "maliciously" in Instruction No. 16 did not comply with this Court's *774 direction in Wilkerson . He also seems to assert that by using both the words "malice" and "maliciously" in the instruction, the district court confused the jury as to the mens rea of second-degree murder. We addressed a similar contention in Schmuck .
[¶39] The district court in Schmuck gave a jury instruction which included definitions of malice and maliciously. Id. , ¶ 19, 406 P.3d at 292-93. We noted that the statute uses the term "maliciously," not "malice."
Although "malice" is simply the substantive form of the adverb, 'maliciously,' it is preferable to define a term in the same form that it is used in the instruction and the statute. The district court did not abuse its discretion, however, when it instructed the jury on the definitions of both "malice" and "maliciously." Its definition of "malice" correctly stated the law under Wilkerson , 2014 WY 136, ¶ 27, 336 P.3d at 1200. While the district court incorrectly used the term "malice"-a different form of "maliciously"-we cannot say that substituting a noun for the adverb form of the same root word is prejudicially confusing or misleading with these facts. Either form will convey the same underlying meaning.
Schmuck , ¶ 47, 406 P.3d at 301. Obviously, the district court's use of both "malice" and "maliciously" in Instruction No. 16 was not ideal. However, like in Schmuck , we believe the jury would have understood that malice is the root word of maliciously, and the term maliciously simply means that an act was done with malice.
[¶40] There is an additional concern in this case because the definition of maliciously in this case suffered from a deficiency that was not present in Schmuck . There, the jury was informed that "[t]he term 'maliciously' means that the act constituting the offense was done intentionally but without premeditation, was reasonably likely to result in death and was done recklessly under circumstances manifesting an extreme indifference to the value of human life, and was done without legal justification or excuse." Id. , ¶ 19, 406 P.3d at 292-93. Here, the definition of maliciously mirrored that in Schmuck except it left out the heightened recklessness language. That language was found in the definition of "malice," but not in the definition of "maliciously."
[¶41] Another jury instruction given in this case specifically addressed this situation:
If in these instructions any rule, direction or idea is stated in varying ways, no emphasis is intended, and none must be inferred by you. For that reason, you are not to single out any certain sentence, or any individual point or instruction, and ignore the others. You are to consider all the instructions as a whole, and are to regard each in the light of all the others. The order in which the instructions are given has no significance as to their relative importance.
[¶42] We assume the jury followed the district court's instructions. Schmuck , ¶ 42, 406 P.3d at 300 ; Earley v. State , 2011 WY 164, ¶ 11, 267 P.3d 561, 564 (Wyo. 2011). Taken as a whole, Instructions No. 14, 15 and 16 incorporated all of the requirements set forth in Wilkerson and § 6-2-104 for the mens rea of second-degree murder. Consequently, the district court did not violate a clear and unequivocal rule of law under our plain error analysis.[4]
[¶43] Additionally, even if it could be said that the district court violated a clear and unequivocal rule of law by leaving out the heightened recklessness language when defining maliciously for the jury, Mr. Sindelar has failed to establish the third requirement of plain error-that he suffered material prejudice. It is true, as pointed out by Mr. Sindelar, that the prosecutor focused on the definition of maliciously in his argument. However, in doing so, the prosecutor discussed the part of the definition of maliciously in Instruction No. 16 that required that *775 Mr. Sindelar's act to be "reasonably likely to result in death." While this language is not identical to the heightened recklessness language we adopted in Wilkerson , it incorporates many of the same concepts. See Wilkerson , ¶¶ 15-19, 27, 336 P.3d at 1193-1196, 1200 (discussing Lopez v. State , 2004 WY 28, 86 P.3d 851 (Wyo. 2004) and cases cited therein).
[¶44] Under the facts of this case, there is no question that Mr. Sindelar's action in shooting Mr. Boyer twice in the chest from approximately three feet away was not only reasonably likely to result in death but also demonstrated that he acted recklessly under circumstances manifesting an extreme indifference to the value of human live. Dr. Habbe testified that one of the bullets entered Mr. Boyer's left chest, wounding the heart, aorta, pulmonary artery, esophagus and spinal column. The second bullet entered the left abdomen and wounded the liver, spleen, diaphragm and left lung. Dr. Habbe stated that either of the two wounds was lethal. On these facts, there is no reasonable probability that the result would have been different if the district court had included the heightened recklessness language in the definition of maliciously.
b. Definition of Reckless and Heightened Recklessness
[¶45] Mr. Sindelar asserts that the district court erred by failing to instruct the jury on the definitions of "recklessly" and "recklessly under circumstances manifesting an extreme indifference to the value of human life." He did not offer an instruction with his proposed definitions or otherwise bring the question of defining the terms to the attention of the district court, so the plain error standard applies. Gomez v. State , 2010 WY 108, ¶ 29, 237 P.3d 393, 401 (Wyo. 2010) ; Morris v. State , 2009 WY 88, ¶ 15, 210 P.3d 1101, 1105 (Wyo. 2009).
[¶46] Our decision in Schmuck , ¶ 60, 406 P.3d at 305, directly answers the question of whether the district court violated a clear and unequivocal of rule of law by failing to further define the terms for the jury:
Mr. Schmuck argues that the district court plainly erred by failing to define "recklessly" or "recklessly under circumstances manifesting an extreme indifference to the value of human life." This alleged error, appearing in Instruction No. 18, does not transgress a clear and unequivocal rule of law. The district court provided to the jury the definition of malice prescribed by our holding in Wilkerson , 2014 WY 136, ¶ 27, 336 P.3d at 1200. We did not require a trial court to define "recklessly" to the jury and stated that our formulation of heightened recklessness adequately distinguishes second-degree murder from manslaughter. See id. Therefore, the district court's omission of a definition of "recklessly" or "recklessly under circumstances manifesting an extreme indifference to the value of human life" was not plainly erroneous.
[¶47] There is no requirement in Wyoming law for the district court to define "recklessly" or to add further definition to our statement of what constitutes the heightened recklessness to support a second-degree murder conviction. Therefore, under our precedent, the district court did not violate a clear and unequivocal rule of law when it did not define those terms for the jury.
III. Sudden Heat of Passion
[¶48] Mr. Sindelar claims the district court failed to properly instruct the jury that, in order to prove the malice element of second-degree murder, the State had to prove beyond a reasonable doubt that he did not act in a sudden heat of passion. He further asserts that the stepped verdict form used by the district court compounded the error because it did not allow the jury to consider voluntary manslaughter once it found that he was guilty of second-degree murder. Relying on Shull v. State , 2017 WY 14, 388 P.3d 763 (Wyo. 2017), Mr. Sindelar asserts that the error was structural and requires reversal regardless of whether or not he was prejudiced by it. After Mr. Sindelar filed his appellate brief, we overruled the aspect of the Shull opinion that held such an error was structural in Schmuck , ¶¶ 31-32, 406 P.3d at 297. We ruled that such an error is a simple trial error which, when no objection was made, requires a showing of plain error before *776 reversal is warranted. Id. ; See also , Johns , ¶ 21, 409 P.3d at 1268.
[¶49] The jury instructions on second-degree murder and voluntary manslaughter and the verdict form are contained in the record, satisfying the first part of the plain error test. The instructions failed to inform the jury that the State had the burden of proving that Mr. Sindelar did not act in a sudden heat of passion in order to convict him of second-degree murder and the stepped verdict form directed the jury to ignore voluntary manslaughter if it found he was guilty of second-degree murder. In that sense, the instructions and verdict form violate the law set forth in Shull . Shull was not published until February 2017 and Mr. Sindelar was tried in January 2017, so there was no clear and unequivocal rule of law at the time of Mr. Sindelar's trial. As in other cases involving this issue, see, e.g. , Schmuck , ¶¶ 34-35, 406 P.3d at 298 and Johns , ¶ 22, 409 P.3d at 1268, we do not need to determine whether a clear and unequivocal rule of law must exist at the time of trial to establish plain error because Mr. Sindelar has not shown he was prejudiced by the erroneous jury instructions and verdict form.
[¶50] The district court instructed the jury that
"[h]eat of passion means such passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same or similar circumstances as those in question which would cause him to act rashly, without reflection or deliberation, and from passion rather than from judgment. The heat of passion must arouse suddenly, and the act resulting in death must occur while the Defendant was acting under the direct and immediate influence of such heat of passion, and before sufficient time has elapsed to permit the heat of passion to cool.
[¶51] In a footnote, Mr. Sindelar suggests that there was evidence he acted in a sudden heat of passion because he was scared. He quotes State v. Sorrentino , 31 Wyo. 129, 224 P. 420, 423 (1924) as stating "[f]ear or terror of such character or degree as to render the accused incapable of cool reflection has been considered as a fact in mitigation or extenuation so as to reduce the homicide to manslaughter." See also , 2 Wharton's Crim. L. § 156 (15th ed. 2017) ("Passion is not limited to anger, rage, or resentment. It may include fear, terror, or, according to some cases, 'excitement' or 'nervousness.' " (footnotes omitted) ). In Sorrentino , this Court found that Mr. Sorrentino acted in a heat of passion and not with malice when he shot and killed the decedent who had broken into the house where Sorrentino was staying, opened the door of his bedroom and shined a light in his face. Id. at 423-24.
[¶52] Mr. Sindelar's actions obviously were very different from Sorrentino's. Mr. Sindelar directs us to no evidence that he acted in a sudden heat of passion resulting from fear. In fact, he points to no place in the record showing that he killed Mr. Boyer while acting rashly or as a result of passion rather than judgment. He also does not explain the circumstances surrounding his claimed fear. We cannot tell from his argument whether he is asserting that he was afraid as he was driving to Mr. Boyer's house because his house had been broken into or whether his fear arose when he supposedly saw a knife in Mr. Boyer's hand.
[¶53] Mr. Sindelar testified that he drove to Mr. Boyer's home to "talk" to him. He did not testify that his judgment was impaired by fear brought on by his house having been broken into and his possessions damaged. In fact, Mr. Sindelar emphasized in his testimony that he was thinking rationally when he made the decision to visit Mr. Boyer and just wanted to "talk" to him and possibly renew their friendship.
[¶54] If Mr. Sindelar is referring to the "fear" he felt from supposedly seeing the knife in Mr. Boyer's hand, this pertained to his self-defense theory and the necessity of using deadly force, not a sudden heat of passion. Even then, there was no evidence that he was incapable of rational judgment. Mr. Sindelar testified that, upon seeing the knife in Mr. Boyer's hand, he warned him that he had a gun. He testified that he shot Mr. Boyer to defend himself. This testimony simply does not support, in any way, that he acted rashly, without reflection or deliberation, *777 and from passion rather than from judgment.
[¶55] Furthermore, defense counsel never mentioned in his closing argument the possibility that Mr. Sindelar acted in a sudden heat of passion to convince the jury that he should be convicted of manslaughter instead of second-degree murder. The only reference to fear was in the context of his argument that Mr. Sindelar believed he was in imminent danger of death or serious bodily harm and, therefore, shot Mr. Boyer in self-defense. There was no evidence Mr. Sindelar killed Mr. Boyer in a sudden heat of passion; consequently, he was not prejudiced by the district court's failure to instruct the jury in accordance with Shull, supra.[5]
CONCLUSION
[¶56] The district court incorrectly instructed the jury that Mr. Sindelar was required to retreat before he could use deadly force. However, the instruction did not prejudice him because it was clear from the evidence that he was the aggressor in the conflict. The district court correctly instructed the jury on the mens rea element of second-degree murder. The district court's failure to instruct the jury that the State had the burden of proving Mr. Sindelar did not act in a sudden heat of passion to convict him of second-degree murder and its use of the stepped verdict form which kept the jury from considering the sudden heat of passion if it found him guilty of second-degree murder was erroneous. However, there was no evidence or argument that Mr. Sindelar acted in a sudden heat of passion, so he was not prejudiced by the incorrect instructions or verdict form.
[¶57] Affirmed.

Relying on Shull v. State , 2017 WY 14, 388 P.3d 763 (Wyo. 2017), Mr. Sindelar states that the error in failing to properly instruct on "sudden heat of passion" was structural and requires reversal regardless of whether or not he was prejudiced by it. As explained more fully below, Schmuck v. State , 2017 WY 140, 406 P.3d 286 (Wyo. 2017) overruled the aspect of the Shull opinion that held such an error was structural and held, instead, that it is simple trial error. Consequently, when no objection was made at trial to incorrect instructions on the relationship between murder and voluntary manslaughter, the appellant must show that the district court committed plain error, including showing that he suffered material prejudice, before reversal is warranted. See Johns v. State , 2018 WY 16, ¶ 20, 409 P.3d 1260, 1267 (Wyo. 2018).

Mr. Sindelar had earlier said that the first thing he saw when Mr. Boyer opened the door was the knife.

Given Mr. Sindelar was acquitted of first-degree murder at his first trial, the constitutional prohibition against double jeopardy prevented a second trial on that charge. See, e.g. , Bowlsby v. State , 2013 WY 72, ¶ 8, 302 P.3d 913, 916 (Wyo. 2013) ; Landeroz v. State , 2011 WY 168, ¶¶ 17-18, 267 P.3d 1075, 1080 (Wyo. 2011).

The State offers to concede that the district court violated a clear and unequivocal rule of law when it instructed the jury on the definition of maliciously. The parties did not have the benefit of our analysis of this issue in Schmuck when they briefed and argued this case, so the State's position on this issue is understandable. However, in light of our decision in Schmuck and the jury instruction which specifically directed the jury not to single out or ignore any aspect of the instructions and to consider the instructions as a whole, we decline the State's offered concession. See Anderson v. State , 2018 WY 6, ¶¶ 20-30, 408 P.3d 1148, 1153-55 (Wyo. 2018).

Given the lack of evidence of "sudden heat of passion," it would have been within the district court's discretion to refuse to instruct the jury on the lesser offense of manslaughter. Johns , ¶ 23, 409 P.3d at 1268 (citing Dean v. State , 2003 WY 128, ¶ 19, 77 P.3d 692, 699 (Wyo. 2003) (a lesser-included offense instruction should not be given in the absence of some minimal evidentiary support) ).