# IN THE SUPREME COURT, STATE OF WYOMING
## 2020 WY 46

APRIL TERM, A.D. 2020

*April 6, 2020*

THE STATE OF WYOMING,

Petitioner,

v.

S-19-0046

JASON TSOSIE JOHN,

Respondent.

Original Proceeding
Petition for Writ of Review/Certiorari
District Court of Natrona County
The Honorable Catherine E. Wilking, Judge

*Representing Petitioner:*
    Bridget L. Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Samuel L. Williams, Assistant Attorney General; Kevin D. Taheri, Special Assistant Attorney General. Argument by Mr. Williams.

*Representing Respondent:*
    Office of the State Public Defender: Diane M. Lozano, Wyoming Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Desiree Wilson, Senior Assistant Appellate Counsel. Argument by Ms. Wilson.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]    In August 2018, the State charged Jason Tsosie John with one count of first degree murder.  The district court dismissed the case under Wyo. Stat. Ann. § 6-2-602(f), which the legislature had only recently added to the self-defense statutes.  2018 Wyo. Sess. Laws, ch. 135 (amending Wyoming Statute §§ 6-1-204 and 6-2-602).  Subsection (f) states "[a] person who uses reasonable defensive force as defined by subsection (a) of this section shall not be criminally prosecuted for that use of reasonable defensive force."  Wyo. Stat. Ann. § 6-2-602(f) (LexisNexis 2019).  We granted the State's petition for writ of review to address several matters of first impression regarding the statute's meaning and application.  We conclude § 6-2-602(f) is a mandatory immunity provision carrying with it a judicial gatekeeping function following the preliminary hearing.  The accused must present a prima facie showing that § 6-2-602(f) applies.  If the accused satisfies this minimal burden, the burden shifts to the State to establish by a preponderance of the evidence that § 6-2-602(f) does not apply.  Though the district court applied a different burden and standard when adjudicating Mr. John's motion to dismiss, its error was harmless, and we affirm.

## ISSUES

[¶2]    We restate the issues as follows:

> I. Did the district court err when it concluded Wyo. Stat. Ann. § 6-2-602(f) is a "true immunity" provision carrying with it a gatekeeping function for courts?

> II. Did the district court err when it considered Mr. John's pretrial motion to dismiss after an evidentiary hearing?

> III. Did the district court erroneously grant Mr. John's motion to dismiss?

## BACKGROUND

### A. Statutory Amendments

[¶3]    The legislature substantially amended Wyo. Stat. Ann. § 6-2-602 during the 2018 Budget Session.[1]  2018 Wyo. Sess. Laws, ch. 135.  Those amendments took effect approximately one month before the State charged Mr. John with first degree murder.  *Id.*

---

[1] Section 6-2-602 is one of two statutes in Title 6. Crimes and Offenses, Chapter 2. Offenses Against the Person, Article 6. Justification.  The other statute in Article 6 states "[t]he common law shall govern in all cases not governed by this article."  Wyo. Stat. Ann. § 6-2-601 (LexisNexis 2019).  It has not been amended since its enactment in 2008. *See id.*

1

[¶4]    As amended, the statute provides in relevant part:[2]

§ 6-2-602. Use of force in self defense; no duty to retreat.

(a) The use of defensive force whether actual or threatened, is reasonable when it is the defensive force that a reasonable person in like circumstances would judge necessary to prevent an injury or loss, and no more, including deadly force if necessary to prevent imminent death or serious bodily injury to the person employing the deadly force or to another person. As used in this subsection, "necessary to prevent" includes a necessity that arises from an honest belief that the danger exists whether the danger is real or apparent.

(a) (b)  A person is presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to himself or another when using defensive force, that is intended or likely to cause death or serious bodily injury to another including deadly force if:

(i) The intruder against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, another's home or habitation or, if that intruder had removed or was attempting to remove another against his will from his home or habitation; and

(ii) The person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring.

. . . .

(c) (d)  A person who unlawfully and by force enters or attempts to enter another's home or habitation is presumed to be doing so with the intent to commit an unlawful act involving force or violence.

(e) A person who is attacked in any place where the person is lawfully present shall not have a duty to retreat before using

---

[2] The legislature added the underlined language to the statute and removed the stricken language. *See* 2018 Wyo. Sess. Laws, ch. 135; Wyo. Stat. Ann. § 6-2-602 (LexisNexis 2019).

2

> reasonable defensive force pursuant to subsection (a) of this section provided that he is not the initial aggressor and is not engaged in illegal activity.
>
> (f) A person who uses reasonable defensive force as defined by subsection (a) of this section shall not be criminally prosecuted for that use of reasonable defensive force.
> (d) (g) As used in this section:
>
> . . . .
>
> (iii) "Deadly force" means force that is intended or likely to cause death or serious bodily injury.

*Id*.

### B. The Shooting and Court Proceedings

[¶5]    The amended statute's meaning and application are hotly contested in this case, the facts of which do not establish the defense of one's home against an unknown intruder. Mr. John, the accused, knew Wesley Willow, the deceased. Each had a relationship with Melissa Hayden. Ms. Hayden and Mr. John dated from June to July 2018. Prior to that, Ms. Hayden dated Mr. Willow. She resumed dating Mr. Willow after she and Mr. John broke up. Ms. Hayden and Mr. Willow had two children.

[¶6]    On Friday, August 3, 2018, the night of the shooting, Ms. Hayden, Mr. Willow, and Nicholas Heims were celebrating Ms. Hayden's birthday at a hotel in Casper, Wyoming. Ms. Hayden had an active protection order against Mr. Willow and, as a condition of her felony probation, should not have been with him. Ms. Hayden and Mr. Willow did not know Mr. Heims until they met him that night at the hotel.

[¶7]    A series of text messages between Mr. John and Ms. Hayden precipitated the confrontation that resulted in Mr. Willow's death. Mr. John sent Ms. Hayden text messages at 3:42 and 3:44 a.m. expressing his disgust about her relationship with Mr. Willow. Ms. Hayden responded at 3:46 a.m. The messages escalated over the next few minutes and Ms. Hayden ultimately told Mr. John, "Stop texting me. . . . . . Done." Mr. John did not stop. His next text said "Fucking Crackhead… can't even be a real mom. That's the truth!" Then, at 3:53 a.m. Ms. Hayden, or someone using her phone, texted back "I'm fuck you up Bitch!" Mr. John, apparently presuming Ms. Hayden sent the message, responded: "Go head…"; "I'll blow you away just like Wesley [Willow] and Will. To protect J[] and J[] and N[]!  Fuck yeah!  Test me bitch!"; "Come at me!"; "My kids are my life!"; "I don't fuck around!!!"  When Ms. Hayden showed Mr. Willow the text messages, "all hell broke loose."

[¶8]   A one-minute phone call between Mr. Willow and Mr. John occurred shortly after, at 3:56 a.m.  The exact words spoken during the phone call are unclear, but Mr. Heims heard Mr. Willow ask "where you at" and then repeat the number "75," which was the trailer spot where Mr. John lived.  When the call ended, Mr. Heims and Ms. Hayden understood that Mr. Willow intended to go to Mr. John's home to fight him.

[¶9]   The three drove to the area where Mr. John lived.  They parked several spots past Mr. John's trailer to avoid being seen.  Ms. Hayden and Mr. Willow were intoxicated.  Ms. Hayden brought an empty vodka bottle to hit Mr. John over the head.  Mr. Willow was unarmed.  Mr. Heims had a closed knife.

[¶10]  As they walked toward Mr. John's home they saw him standing on the porch or in the front doorway holding an "AR-15 style rifle" with a mounted flashlight.  Mr. John's mother and young son were sleeping inside.  Mr. John and Mr. Willow shouted back and forth.  Though Mr. John warned the group to "get back" or "get out of here," Mr. Willow did not heed the warning.  As Mr. Willow sprinted into Mr. John's home, Mr. John fired nine shots in rapid succession.  Several struck Mr. Willow.

[¶11]  Awoken by the commotion, Mr. John's mother came out to the living room, took the rifle from Mr. John, and called 911 at 4:12 a.m.  First responders could not revive Mr. Willow and pronounced him dead at the scene.

[¶12]  Three days later, on August 6, the State charged Mr. John with first degree murder, alleging he "purposely and with premeditated malice" killed Mr. Willow, in violation of Wyo. Stat. Ann. § 6-2-101(a).

[¶13]  At the preliminary hearing less than two weeks later, the State informed the circuit court the evidence would show Mr. John sent disparaging text messages to Ms. Hayden about her and Mr. Willow's children, agreed to fight Mr. Willow, provided Mr. Willow his address, and then "ambush[ed]" him with a firearm and killed him.  Though Mr. John asked the court to decide whether the shooting was lawful and directed the court's attention to the newly amended statute, the court declined to decide whether § 6-2-602(f) applied because it had unanswered questions about the facts and there was no precedent applying the statute.  The circuit court bound the case over to district court.

[¶14]  Mr. John pleaded not guilty at arraignment and the district court scheduled trial for mid-February.  At the end of December, Mr. John filed his "Motion for Dismissal Pursuant to Wyoming Statute § 6-2-602 or in the Alternative Enforcement of Wyoming Statute § 6-2-602(f)."  He argued the State had to prove § 6-2-602(f) did not apply.  According to Mr. John, the State could not meet its burden because he was "presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to himself or another" under subsection (b), Mr. Willow was presumed to be entering his home "with the intent

4

to commit an unlawful act involving force or violence" under subsection (d), and he had no duty to retreat under subsection (e).

[¶15] The State responded that § 6-2-602(f) did not entitle Mr. John to a separate pretrial immunity hearing in the district court. Alternatively, it asserted Mr. John was not entitled to statutory immunity because Mr. Willow's entry into his home was not "unlawful" or "forcible," there were reasonable alternatives to deadly force Mr. John failed to exercise, and Mr. John used more force than necessary under the circumstances.

[¶16] The district court heard Mr. John's motion to dismiss on February 1, 2019. The court first identified questions left unanswered by the amended statute: "[I]s the defendant entitled to a pretrial immunity hearing[?] And, if so, who bears the burden at the hearing and what is the standard of evidence that would be required to meet that burden[?]" Then the court concluded the amended statute entitled Mr. John to a pretrial hearing because it created "true immunity" for persons who were justified in their use of defensive force, and that immunity carries with it a procedural "gatekeeping function" for courts.

[¶17] The hearing proceeded to an evidentiary phase. Casper Police Detective Anthony Stedillie recounted various witness statements from Ms. Hayden, Mr. Heims, and Mr. John's mother, as well as statements Mr. John made at the scene and the hospital. The State introduced the postmortem examination report and a copy of text messages, the call log, and the internet search history from Mr. John's phone. Defense counsel thoroughly cross-examined the detective and introduced a photograph showing the location of Mr. Willow's body inside Mr. John's home after the shooting.

[¶18] The court made thorough findings before orally granting Mr. John's motion to dismiss:

> It has been established that the defendant and Ms. Hayden were in a dating relationship. That relationship ended sometime in July of 2018, and Ms. Hayden had apparently reconciled with Mr. Willow and the two were celebrating her birthday on the date of this offense.
>
> On August 3rd of 2018, there is a dispute between the defendant and Ms. Hayden and that occurs via text messages, and those are in evidence.
>
> Mr. Heims indicated that, after this series of text messages was received by Ms. Hayden, one of them in particular upset her greatly, was shown to Mr. Willow, and then Mr. Heims testified that all hell broke loose.

Then we have a call being placed using Ms. Hayden's phone, but it's Mr. Willow placing the call to the defendant, and that call is made at 3:56 a.m. and lasts one minute. And there is some sort of an exchange between Mr. Willow and Mr. John, which, when that call ends, Mr. Heims and Ms. Hayden understood that Mr. Willow intended to go to Mr. John's home to fight him. Then we have Mr. Willow, Mr. Heims, and Ms. Hayden traveling to the defendant's home by vehicle.

Ms. Hayden has testified that Mr. Willow had threatened to beat Mr. John up. And then, after the phone call is made and they're in the car, there are these texts that are being sent by Mr. John. But the evidence is that those texts were never read by Ms. Hayden, Mr. Willow, or Mr. Heims prior to the shooting.

The testimony is that Ms. Hayden knew where the defendant lived and gave directions to Mr. Willow to get there, that Mr. Willow was intoxicated and had a blood alcohol concentration of .20.

The testimony is that Mr. Willow parked in Lot Number 69, and the three of them then proceeded to travel by foot to Lot Number 75, which was where the defendant was residing. And that Mr. Heims indicated that they parked at Lot Number 69 because Mr. Willow told him he didn't want the car to be seen before or after.

Ms. Hayden stated that she had an empty vodka bottle that she had with her as she approached the defendant's home and that she brought it because she intended to use it against the defendant and, eventually, she did do that; although, it happened after the shooting. And Ms. Hayden was also intoxicated to an unknown extent.

Ms. Hayden stated to the officers that she thought the physical confrontation would occur outside of the defendant's residence. It's somewhat unclear whether -- where her part was in that. I know the statement was made that she thought she would meet the defendant outside and hit him on the head with the vodka bottle and then whatever else happened, happened. That could very well mean that she believed, then,

6

Mr. Willow and the defendant would fight after she struck him with the vodka bottle.

And there is also a statement that Mr. Heims was armed with a closed knife when approaching the defendant's home.

The defendant had an AR-15 style rifle weapon. It had a flashlight mounted on it. And both Mr. Heims and Ms. Hayden saw the gun and also indicated that the light was shining on them as they approached the defendant's home, and that the light was shone on all three of them. And there's an indication that Mr. Heims was an unknown male to the defendant at the time he was approaching.

The evidence also shows that the defendant was either standing on his porch or the threshold of his home when the three individuals were approaching his home.

The evidence has shown that the defendant yelled back and forth with the three individuals as they approached the home. It's unclear what words were exchanged, but they were yelling back and forth.

But it is in the evidence that, before any shots were fired, the defendant yelled either "get back" or "get out of here." The defendant told the officers that he said "back the F up" approximately three times prior to any shots being fired.

Mr. Heims stated that the defendant stepped back into the defendant's home when Mr. Willow charged up the steps of the home. And Ms. Hayden also stated that Mr. Willow sprinted straight for the defendant because he does not back down; meaning Mr. Willow does not back down.

And Ms. Hayden indicated that Mr. Willow went past her, as she was in the front, as they originally made their approach. And Mr. Heims indicated that Mr. Willow was moving quickly, that he was angry, and moving toward the house with what he described as an angry step.

The defendant fired shots. Apparently, there were 30 in the magazine. He fired nine shots. Two struck Mr. Willow in the

7

chest and six in the backside of his body. These shots were made in rapid succession with no break in the shots fired.

Mr. Willow's body was inside of the defendant's home, and that is most clearly demonstrated to the Court by Exhibit A. That is a photo of his body inside the defendant's home. It's quite close to a tan-colored recliner in the defendant's home.

There are statements that the defendant's door was open when the light was being shone by him on the three individuals approaching his home. The officer testified that the lock on his door was operational. The defendant told the officers that he, in fact, closed the door and Mr. Willow opened it and entered his home.

Mr. Willow was not armed when he approached the defendant's home. The defendant did make eight calls. In between the call with Mr. Willow at 3:56 a.m., he made three phone calls to Ms. Hayden: one at 4:02, one at 4:05, and one at 4:09 a.m.; he made one to somebody identified as Soppy, S-O-P-P-Y, at 4:01 a.m.; and he made four calls to a Shannon Homolka: one at 3:58, one at 4:01, one at 4:06, and one at 4:07. So the last call that I can see being made or attempted by the defendant happened at 4:07.

The defendant's mother and his young son were in the home when this occurred. The defendant did not invite Mr. Willow into his home.

And then we have the 911 call being made by Ms. George at 4:12 a.m. So we have an interval of 4:07, when the last call is made by the defendant to Ms. Homolka, to the 911 call being made at 4:12 a.m.

The defendant stated to officers that Mr. Willow rushed him, and that he shot him. The evidence also establishes that, after the 3:56 a.m. call, that lasted until 3:57, it was after that call was made that the three individuals left the Royal Inn and then traveled to . . . the defendant's home.

Between 4:02 and 4:06, there were those text messages that were sent to Ms. Hayden's phone, but the evidence is that those

8

texts were never seen by Mr. Willow, Mr. Heims, or Ms. Hayden.

That is somewhat different than the presentation that was made by the State in prior hearings, particularly the 404(b) hearing, where it was presented that those texts were received, and that is what was goading Mr. Willow on. But it appears that is not the case based on what was presented today.

[¶19] Based on these findings, the district court reached the following conclusions, set forth both at the hearing and in its written order:

1. That the Defendant was lawfully present in his own home, he was not the initial aggressor in this case and he was not engaged in illegal activity when he was in his home.

2. That the Defendant had no duty to retreat.

3. Th[at] Mr. Willow was not invited into the home of the Defendant.

4. Mr. Willow instigated the violence in this case and the violence was contemporaneous and the risk of serious bodily harm or death to the Defendant or others within his home was considered imminent by the Defendant.

5. This was a very dangerous encounter that escalated in mere seconds.

6. Mr. Willow was warned to stay back by the Defendant, instead he made an unlawful and highly provocative and violent entry into the Defendant's home and the presumptions are that he intended to commit an unlawful act involving force or violence.

7. There is no indication that there was an act of disengagement on the part of Mr. Willow once he started running toward the Defendant.

8. The Defendant fired 9 shots from a magazine of 30 rounds from an AR-15-type rifle, in rapid succession with no discernable break in the time between those shots.

9. That Defendant was in his own home and the body of Mr. Willow was also found in the home of the Defendant.

10. That the Defendant's reasonable and honest belief that deadly force was necessary to prevent imminent death or serious bodily injury to himself or another is triggered under the facts of this case.

11. That the statutory presumption of reasonableness is implicated because Mr. Willow unlawfully and forcefully entered the Defendant's home, and that the force that was used by the Defendant was necessary in this case.

12. That the State has not met its burden to establish that probable cause exists to conclude that the Defendant's use of force was not statutorily justified and that the Defendant shall be afforded the protections of Wyoming Statute § 6-2-602, and he shall not be subject to criminal prosecution in this matter.

The district court ordered Mr. John "be afforded the protections of Wyoming Statute § 6-2-602[,]" granted his motion, and dismissed the case.

[¶20]  The State petitioned this Court to review the "Order Dismissing Case Following W.S. 6-2-602 Hearing" under W.R.A.P. 13.01 and 13.02.  It sought broad review of the district court's decision, including its interpretation of § 6-2-602(f), the procedures utilized, and application of the law to the facts.  We granted the petition, ordered briefing, and heard argument.

## DISCUSSION

[¶21]  The State raises various arguments, but primarily asserts the district court erred by holding an evidentiary hearing.  According to the State, the plain language of Wyo. Stat. Ann. § 6-2-602(f) and separation of powers principles require the executive branch (i.e., state prosecutors) to apply the provision when deciding whether to charge a person with a crime.  It contends the only authorized judicial determination is the circuit court's probable cause determination at the preliminary hearing.  The State concludes that by conducting a pretrial evidentiary hearing, the district court read a procedure into the statute the legislature did not provide.  The district court therefore exceeded its authority and the dismissal order is void.  Even if the evidentiary hearing was proper, the State argues the court incorrectly applied Wyoming self-defense law to the facts.

[¶22]  As discussed below, we conclude § 6-2-602(f) is a mandatory, judicially enforceable immunity provision.  If an accused asserts protection from prosecution under subsection

(f), the district court must determine whether the statutory immunity requirements have been met. Our remaining analysis therefore focuses on the appropriate procedural framework for a § 6-2-602(f) self-defense immunity determination, including the applicable burdens and standards of proof. We end by considering whether the district court correctly applied the statute to its findings.

## I. *Wyo. Stat. Ann. § 6-2-602(f) is a mandatory, judicially enforceable immunity provision.*

[¶23] The district court correctly interpreted the plain language of Wyo. Stat. Ann. § 6-2-602. Though subsection (f) nowhere uses the word "immunity," it is clearly an immunity provision carrying with it a judicial gatekeeping function to ensure the executive branch does not prosecute individuals who exercised reasonable force in self-defense. As such, § 6-2-602(f) preserves, rather than violates, the separation of powers between the legislature, executive, and judiciary.

[¶24] Statutory interpretation is a matter of law we review de novo. *Cercy v. State*, 2019 WY 131, ¶ 20, 455 P.3d 678, 685 (Wyo. 2019) (citation omitted). "In interpreting and construing statutory language, our primary purpose is to determine the legislature's intent." *Stutzman v. Office of Wyoming State Eng'r*, 2006 WY 30, ¶ 14, 130 P.3d 470, 475 (Wyo. 2006) (citing *Merrill v. Jansma*, 2004 WY 26, ¶ 28, 86 P.3d 270, 284–85 (Wyo. 2004)). "Where the language is clear, we look to its ordinary and obvious meaning, are bound to the results so expressed and do not resort to rules of construction." *Id.* (citation omitted). "A statute is unambiguous if its wording is such that reasonable persons are able to agree concerning its meaning with consistency and predictability." *Id.* (citation omitted). "Ultimately, whether a statute is ambiguous is a matter of law to be determined by the court." *Id.* ¶ 15, 130 P.3d at 475 (citation omitted).

[¶25] Subsection (f) states "[a] person who uses reasonable defensive force as defined by subsection (a) ***shall not*** be criminally prosecuted for that use of reasonable defensive force." Wyo. Stat. Ann. § 6-2-602(f) (emphasis added). Subsection (f) clearly and unambiguously prohibits prosecution of a person who uses reasonable defensive force. We have repeatedly recognized "use of the word 'shall' in a statute makes the provision mandatory." *Halling v. Yovanovich*, 2017 WY 28, ¶ 37, 391 P.3d 611, 623 (Wyo. 2017) (quoting *Wyo. Dep't of Revenue v. Qwest Corp.*, 2011 WY 146, ¶ 30, 263 P.3d 622, 632 (Wyo. 2011)). The phrase "shall not" is likewise mandatory in the prohibitive sense, and "intimates an absence of discretion" in applying subsection (f) immunity so long as all statutory conditions are satisfied. *See In re MN*, 2007 WY 189, ¶ 5, 171 P.3d 1077, 1080 (Wyo. 2007) (quoting *In re LePage*, 2001 WY 26, ¶ 12, 18 P.3d 1177, 1180 (Wyo. 2001)). If, as the State suggests, the legislature intended § 6-2-602(f) to be nothing more than a directive for the executive branch to avoid prosecuting a person who used reasonable defensive force under subsection (a), it could and would have said so. *See Hall v. Park*

*Cty.*, 2010 WY 124, ¶ 12, 238 P.3d 580, 584 (Wyo. 2010). Instead, subsection (f) flatly prohibits such prosecution under certain factual circumstances.

[¶26] When the legislature amended § 6-2-602 in 2018, it exercised its exclusive power to determine and declare what acts constitute a crime when the underlying facts implicate self-defense principles. *See* 2018 Wyo. Sess. Laws, ch. 135; *see also Billis v. State*, 800 P.2d 401, 415 (Wyo. 1990). If the executive branch prosecutes someone who then claims the protection of subsection (f), the court must determine whether a sufficient factual predicate exists to apply the statutory bar. This judicial gatekeeping function is no different from other forms of criminal adjudication requiring the court to apply statutory standards to the facts.

[¶27] Courts perform a similar function when they conduct pretrial hearings to determine whether a pending prosecution would constitute double jeopardy or violate the defendant's right to a speedy trial. The court's adjudicatory role in resolving those substantive legal issues is not materially different from the court's adjudicatory, or gatekeeping, role in deciding whether an accused is immune from further prosecution under § 6-2-602(f). *See Billis*, 800 P.2d at 423 (noting the judiciary has exclusive power in a prosecution "to adjudicate substantive legal issues raised by the litigants"); *see also People v. Guenther*, 740 P.2d 971, 976–78 (Colo. 1987) (rejecting a separation of powers challenge to Colorado's self-defense immunity statute). The district court fittingly took on the role of resolving the subsection (f) issues in this case.

## II.     *The district court appropriately considered Mr. John's pretrial motion to dismiss following an evidentiary hearing.*

[¶28] The district court appropriately heard Mr. John's motion to dismiss at an evidentiary hearing following his preliminary hearing. Although we conclude the district court should have applied different burdens and standards of proof when evaluating the motion to dismiss, the error was harmless.

### A. Immunity determinations are beyond the scope and purpose of preliminary hearings.

[¶29] Circuit courts are responsible for conducting "[p]reliminary examinations for persons charged with a felony[.]" Wyo. Stat. Ann. § 5-9-132(b) (LexisNexis 2019). The scope of a preliminary hearing is constrained. Its limited purpose is for the circuit court to determine whether there is "probable cause to believe that the charged offense or lesser included offense has been committed and that the defendant committed it[.]" W.R.Cr.P. 5.1(b); *see Madrid v. State*, 910 P.2d 1340, 1343 (Wyo. 1996) (citing *Garcia v. State*, 667 P.2d 1148, 1154 (Wyo. 1983)). The hearing is intended "to determine whether there is a sound basis for continuing to hold the accused in custody, to make sure that he is not being held on some capricious or nebulous charge." *Wilson v. State*, 655 P.2d 1246, 1251 (Wyo.

12

1982). The State must present a sufficient basis "to cause a person of ordinary caution or prudence to conscientiously entertain a reasonable belief that a public offense has been committed in which the accused participated." *Id.* A probable cause finding may be based on hearsay and "[t]he defendant may cross-examine adverse witnesses and may introduce evidence." W.R.Cr.P. 5.1(b).

[¶30] In *State v. Carter*, 714 P.2d 1217 (Wyo. 1986), we addressed the narrow set of issues properly decided at preliminary hearings. The principles we set forth in *Carter* are instructive here. The State charged Mr. Carter with two related drug crimes: delivery of marijuana (Count I) and possession with intent to deliver hash oil (Count II). *Id.* at 1218. At the close of evidence at the preliminary hearing, Mr. Carter moved to dismiss Count II on grounds it merged into Count I. *Id.* The court accepted briefs on the question, held a hearing, and dismissed the second count. *Id.* We sustained the State's bill of exceptions to the dismissal because the court had no authority to dismiss the charge at the preliminary hearing. *Id.* at 1219–20. Instead, the court's authority was limited to determining whether probable cause supported the charges, and if it did, binding the charges over to the district court. *Id.* at 1219. Mr. Carter could have then moved to dismiss Count II in the district court under what is now W.R.Cr.P. 12(b). *Id.* at 1219, 1219 n.1.

[¶31] We reasoned that a court "should not attempt or be called upon to decide difficult legal questions" at a preliminary hearing. *Id.* at 1219 (citing 21 Am.Jur.2d Criminal Law § 428 (1981)). Nor should a court "ask for and receive briefs on disputed legal points." *Id.* (citing *State ex rel. Berger v. Jennings*, 110 Ariz. 441, 520 P.2d 313 (1974)). We explained that those principles developed "due in part to the summary nature of the preliminary hearing":

> It is held promptly after arrest. Neither side has much time to prepare. The prosecution presents only so much of its case as is necessary to establish probable cause, reserving the remainder for trial. The accused may very well offer no evidence unless he can demonstrate the absence of probable cause. Just as the preliminary hearing is an inappropriate forum for deciding the important issues involved in a motion to suppress, 2 LaFave & Israel, Criminal Procedure § 14.4 (1984), so too is it an inappropriate forum for deciding other complicated legal questions. The preliminary hearing is designed to be a quick, efficient means of determining whether the accused should be detained and of ensuring the effective administration of justice.

*Id.* at 1219–20.

13

[¶32]  Mr. John's preliminary hearing implicates those same principles.  The question of self-defense immunity under § 6-2-602(f) is inherently complex; resolution of that question is well-beyond the limited scope and purpose of a preliminary hearing.  In addition, Mr. John's preliminary hearing occurred less than two weeks after the incident, when it was still being investigated.  Facts and witness statements evolved over the course of the investigation.  These points were not lost on either the circuit or district court.

[¶33]  While immunity should be determined as early as possible to ensure the accused spends no more time than necessary enmeshed in criminal proceedings, whether an accused is immune from prosecution under § 6-2-602(f) should not be decided at the preliminary hearing.

### B. The procedural framework, burdens, and standards from *Hall v. State* apply.

[¶34]  *Hall v. State*, 851 P.2d 1262 (Wyo. 1993)—a transactional immunity[3] case—sets forth the appropriate procedural framework in which to decide whether an accused is entitled to self-defense immunity under § 6-2-602(f).  *Hall* similarly involved murder charges and a pretrial motion to dismiss based on immunity.  *Id.* at 1264–65.  Mr. Hall asked the district court to dismiss the charges before trial on grounds that the prosecutor had granted him immunity from prosecution for any involvement he may have had in the murder.  *Id.* at 1265.  The record disclosed the alleged agreement granting him transactional immunity in exchange for his cooperation and testimony.  *Id.*

[¶35]  In deciding Mr. Hall's motion to dismiss, the district court concluded the State had granted Mr. Hall immunity from prosecution on the conspiracy charge.  *Id.*  With respect to the State's claim that Mr. Hall had forfeited his immunity, the district court required the State to prove, by clear and convincing evidence, the nature of the immunity agreement, the manner in which Mr. Hall had violated it, and that Mr. Hall's violation was material. *Id.*

[¶36]  Relevant to this case, on review of Mr. Hall's petition for writ of certiorari, we addressed what procedure to follow to prove that immunity had been granted or forfeited, and what burden of proof to apply.  *Id.* at 1264, 1268–69.  We concluded W.R.Cr.P. 16, subsequently renumbered as W.R.Cr.P. 12,[4] offered Mr. Hall a vehicle for raising

---

[3] "Transactional immunity" is "[i]mmunity from prosecution for any event or transaction described in the compelled testimony." *Black's Law Dictionary* 900 (11th ed. 2019).  It is distinct from "use immunity," which is "[i]mmunity from the use of the compelled testimony (or any information derived from that testimony) in a future prosecution against the witness." *Id.*  "Transactional immunity" is broader than "use immunity."  *Id.*  "After granting use immunity, the government can still prosecute if it shows that its evidence comes from a legitimate independent source." *Id.*

[4] Rule 16 was renumbered in December 1991 as Rule 12.  Order Adopting the Revised Wyoming Rules of Criminal Procedure (12/23/1991), *available at* https://www.courts.state.wy.us/wp-content/uploads/

14

immunity prior to trial. *Id.* at 1268. But because we were not satisfied the district court had conducted an appropriate evidentiary hearing, we remanded the case with the following guidance:

> We remand the case for an appropriate hearing pursuant to W.R.Cr.P. 16 at which Hall must make a *prima facie* case demonstrating the grant of immunity. The State then must establish, by a preponderance of the evidence, no immunity actually was granted or the effective limitation upon the immunity granted. The State also must assume the burden of demonstrating, by a preponderance of the evidence, the forfeiture of any immunity extended because of Hall's breach of the agreement.
>
> After that hearing, if the court permits the trial to go forward as to either of the charges, Hall may ***still choose to*** assert immunity as a defense at the trial. That issue would be tried as an affirmative defense in the usual course of events, and the completeness and truthfulness of Hall's statements, as well as the inculpatory content of those statements, would be ascertained by the jury.

*Id.* at 1268–69 (emphasis in original).

[¶37]   We conclude here, as in *Hall*, that Wyoming Rule of Criminal Procedure 12 governs pretrial pleadings and motions pertaining to immunity from prosecution. W.R.Cr.P. 12(b).

[¶38]   We agree with the State that a § 6-2-602(f) immunity claim does not constitute an objection "based on defects in the institution of the prosecution," which the accused ***must*** raise before trial.[5] The broad language at the beginning of Rule 12(b), however, permits

---

2017/05/crimpro_1991122300.pdf; *see also Hall*, 851 P.2d at 1267 (comparing former W.R.Cr.P. 16 to its federal equivalent F.R.Cr.P. 12).

[5] W.R.Cr.P. 12(b) specifies that "[t]he following must be raised prior to trial":

> (1) Defenses and objections based on defects in the institution of the prosecution;
>
> (2) Defenses and objections based on defects in the indictment or information (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings);
>
> (3) Motions to suppress evidence;

the court to hear "[a]ny defense, objection, or request" capable of determination without trial. An accused may raise his § 6-2-602(f) immunity claim in reliance on that broad language. W.R.Cr.P. 12(b).

[¶39] The State nonetheless attempts to distinguish *Hall* on the basis that § 6-2-602(f) "require[s] courts to find the individual did or did not engage in chargeable conduct." The State cites no pertinent authority, and we have found none, to suggest this is a meaningful or dispositive distinction. A determination whether transactional immunity had been granted or forfeited also requires the court to make factual determinations. So too do motions to suppress evidence under Rule 12(b)(3). Rule 12 explicitly recognizes that district courts may be called on to make dispositive pretrial factual determinations. W.R.Cr.P. 12(f) ("Where factual issues are involved in determining a motion, the court shall state its essential findings on the record.").

[¶40] The guidance we provided in *Hall* applies equally to self-defense immunity. When the accused moves to dismiss a criminal charge pursuant to W.R.Cr.P. 12(b), asserting self-defense immunity under § 6-2-602(f), the district court must hold an evidentiary hearing to determine whether he may be tried for the charge. The accused must make a prima facie showing that § 6-2-602(f) applies.[6] If he satisfies this minimal burden, the burden shifts to the State to establish by a preponderance of the evidence that § 6-2-602(f) does not apply. If the State cannot meet its burden the charge must be dismissed. If the court denies the motion to dismiss and the case proceeds to trial, the accused may raise self-defense as an affirmative defense at trial.[7] *See, e.g.*, *Widdison v. State*, 2018 WY 18, ¶ 37, 410 P.3d 1205, 1217 (Wyo. 2018) (citing *Drennen v. State*, 2013 WY 118, ¶ 39, 311 P.3d 116, 129 (Wyo. 2013)); *Johns*, ¶ 14, 409 P.3d at 1265 (citing *Schmuck v. State*, 2017 WY 140, ¶ 69, 406 P.3d 286, 308 (Wyo. 2017); *Haire v. State*, 2017 WY 48, ¶ 25, 393 P.3d 1304, 1311 (Wyo. 2017)).

[¶41] Though the district court applied a different burden and standard of proof,[8] remand is unnecessary. Here, unlike *Hall*, the district court held an appropriate evidentiary hearing

---

(4) Requests for discovery under Rule 16;

(5) Request for a severance of charges or defendants under Rule 14.

*Id.*

[6] "[T]his Court has not stated what quantity of evidence is necessary to satisfy the 'minimal' or 'slight burden' required to make a prima facie showing[.]" *Johns v. State*, 2018 WY 16, ¶ 15, 409 P.3d 1260, 1265 (Wyo. 2018) (addressing the quantity of proof in the trial context). As that question is not dispositive in this case, we will not elaborate here.

[7] We do not decide whether the 2018 statutory amendments affect matters related to a self-defense claim at trial.

[8] By requiring the State to establish probable cause that § 6-2-602(f) did not apply, the district court adopted Kansas's and Kentucky's approach. However, the underlying statutes in both those states expressly referenced "probable cause" and those references were central to the rationale for placing a probable cause burden on the State. *State v. Ultreras*, 296 Kan. 828, 843, 295 P.3d 1020, 1030–31 (Kan. 2013) (noting

16

and made thorough fact findings. The State does not challenge those findings. We therefore turn our attention to whether those facts afford Mr. John immunity under § 6-2-602.

### III. The district court did not err when it granted Mr. John's motion to dismiss.

[¶42] Applying Wyo. Stat. Ann. § 6-2-602, Mr. John is immune from prosecution only if he:

- was lawfully present in his home when the shooting occurred (subsection (e));

- was not the initial aggressor or engaged in illegal activity, and therefore had no duty to retreat (subsection (e));

- is entitled to the presumption his fear was reasonable (subsection (b));

- is entitled to the presumption Mr. Willow intended to commit an unlawful act involving force or violence when he entered Mr. John's home unlawfully and forcefully (subsection (d)); and

- was otherwise justified in using deadly force and the force used was "necessary to prevent an injury or loss, and no more" (subsection (a)).

Whether the district court properly applied the statutory requirements, definitions, and presumptions to the facts is a question of law we review de novo. *See Starrett v. State*, 2012 WY 133, ¶¶ 9–19, 286 P.3d 1033, 1036–40 (Wyo. 2012); *Johnson v. City of Laramie*, 2008 WY 73, ¶ 7, 187 P.3d 355, 357 (Wyo. 2008). Because the record supports the district court's findings of fact and the State does not challenge them, we defer to those findings in our analysis.

[¶43] Section 6-2-602(f) is the sole basis for self-defense immunity. Statutory language therefore governs the analysis. Common law principles consistent with the statutory

---

"[t]he only standard of proof referenced in K.S.A. 21-3219 is to the standard of probable cause" and rejecting the preponderance of the evidence standard adopted by the Colorado Supreme Court, whose statute "makes no mention of any standard"); *Rodgers v. Com.*, 285 S.W.3d 740, 754 (Ky. 2009) ("infer[ring] from [§ 503.085] that the controlling standard of proof remains 'probable cause.'"). Because Wyo. Stat. Ann. § 6-2-602 nowhere mentions probable cause, we conclude the approach followed in Kansas and Kentucky is not appropriate here. We look instead to our precedent for guidance on the appropriate burdens and standards.

language may guide our application of the statutory requirements, definitions, and presumptions, but nothing more. Elements of the common law defense of self-defense have no place in this immunity analysis. *See* Wyo. Stat. Ann. § 6-1-102(b) (LexisNexis 2019) ("Common-law defenses are retained unless otherwise provided by this act."), 6-2-601 (LexisNexis 2019) ("The common law shall govern in all cases not governed by this article."). For the reasons stated below, we hold the court did not err when it granted Mr. John's motion to dismiss.

### A. Mr. John met his prima facie burden.

[¶44] The majority of the evidence at the motion to dismiss hearing was that offered by the State. Recall, the State called one witness, Detective Stedillie, who recounted various witness statements from Ms. Hayden, Mr. Heims, and Mr. John's mother, as well as statements Mr. John made at the scene and the hospital. The State introduced the postmortem examination report and a copy of text messages, the call log, and the internet search history from Mr. John's phone. Defense counsel thoroughly cross-examined the detective and introduced a photograph showing the location of Mr. Willow's body inside Mr. John's home.

[¶45] At the conclusion of the hearing, the district court found that Mr. John was lawfully present in his home when the shooting occurred.[9] Mr. Willow's body was inside Mr. John's home.

[¶46] The district court further found there had been a heated telephone call between Mr. Willow and Mr. John prior to the shooting. After the call ended, Ms. Hayden and Mr. Heims understood that Mr. Willow intended to go to Mr. John's home to fight him. Mr. Willow, Mr. Heims, and Ms. Hayden then drove to Mr. John's home and parked in Lot Number 69 because, according to Mr. Heims, Mr. Willow did not want the car to be seen before or after. The three then walked to Lot Number 75. Both Mr. Willow and Ms. Hayden were intoxicated.

[¶47] As they approached Mr. John's home, Ms. Hayden and Mr. Heims saw Mr. John holding an AR-15 style rifle with a mounted flashlight. Mr. John was either standing on his porch or the threshold when, before any shots were fired, he yelled either "get back" or "get out of here." Mr. John "told the officers he said 'back the F up' approximately three times prior to any shots being fired."

[¶48] Mr. Heims stated that Mr. John stepped back into his home when Mr. Willow charged up the steps. Ms. Hayden stated that Mr. Willow sprinted straight for Mr. John.

---

[9] This fact implicates Wyoming's long-recognized castle doctrine. We recently summarized castle doctrine principles in *Widdison*, ¶¶ 13–14, 410 P.3d at 1211. The legislature codified these principles when it added subsection (e) to § 6-2-602 in 2018. *See* Wyo. Stat. Ann. § 6-2-602(e).

18

Both eyewitnesses indicated Mr. Willow was angry and moving quickly toward Mr. John's house. Mr. John told officers he closed the door and Mr. Willow opened it and entered his home. He said Mr. Willow rushed him, and he shot him.

[¶49] This prima facie evidence satisfies § 6-2-602(e): Mr. John was not the initial aggressor, and there is no indication he was engaged in illegal activity. The record further supports application of the § 6-2-602(b) presumption: Mr. John reasonably feared imminent peril of death or serious bodily injury to himself or another when he used deadly force because (i) Mr. Willow was in the process of unlawfully and forcefully entering or had unlawfully and forcibly entered his home, and (ii) Mr. John knew or had reason to believe that Mr. Willow's unlawful and forcible entry was occurring. Wyo. Stat. Ann. § 6-2-602(b). By its plain language, subsection (b) applies to Mr. John's use of deadly force.

[¶50] Having applied the reasonable fear presumption, the record then supports application of subsection (d) to presume Mr. Willow was entering Mr. John's home with the intent to commit an unlawful act involving force or violence. Wyo. Stat. Ann. § 6-2-602(d).

[¶51] The remaining statutory requirement is whether Mr. John's use of deadly force was "necessary to prevent an injury or loss, and no more[.]" Wyo. Stat. Ann. § 6-2-602(a). The record shows, and the district court found, Mr. John fired only nine of 30 available shots in rapid succession, with no break in between. Two shots struck Mr. Willow in the chest and six struck Mr. Willow's backside in an "encounter that escalated in mere seconds[.]"

[¶52] Mr. John met his prima facie burden of showing that each statutory immunity requirement was satisfied.

### B. The State did not meet its preponderance burden.

[¶53] The State does not dispute that Mr. John was lawfully present in his home, and it concedes that Mr. John was not the initial aggressor. Consequently, the State cannot establish by a preponderance of the evidence that Mr. John did not satisfy § 6-2-602(e), which specifies that "[a] person who is attacked in any place where the person is lawfully present shall not have a duty to retreat before using reasonable defensive force pursuant to subsection (a) of this section provided that he is not the initial aggressor and is not engaged in illegal activity." [10] Wyo. Stat. Ann. § 6-2-602(e).

---

[10] The State argues for the first time on appeal that Mr. John engaged in illegal activity when he accepted Mr. Willow's offer to fight and then continued to goad Mr. Willow. The State presented no such argument in its filings or at the motion to dismiss hearing. Based on the evidence and argument it heard, the district court concluded Mr. John "was not engaged in illegal activity when he was in his home." Because this is not a jurisdictional issue and the State presented no argument or authority it is so fundamental we must consider it, we "adhere to '[o]ur general rule . . . that we will not consider issues not raised in the court

19

[¶54]   The State suggests Mr. John nevertheless had a duty to retreat because he was a mutual combatant.  Our case law holds that a mutual combatant has a duty to withdraw or retreat before he may claim the right to self-defense.  *Haire*, ¶ 36, 393 P.3d at 1313 (citing *Drennen*, ¶ 39, 311 P.3d at 129).  The plain language of § 6-2-602, however, makes no allowance for mutual combatants when determining whether statutory immunity under subsection (f) applies.  "Mutual combatants" are nowhere mentioned in the statute.  *See* Wyo. Stat. Ann. § 6-2-602.  Mr. John had a duty to retreat only if he was "***the*** initial aggressor."  Wyo. Stat. Ann. § 6-2-602(e) (emphasis added).  The State concedes he was not.

[¶55]   As to whether Mr. John used reasonable defensive force pursuant to subsection (a), we note the State did not challenge the district court's application of the reasonable fear presumption provided by subsection (b), or the presumption regarding Mr. Willow's "intent to commit an unlawful act involving force or violence" provided by subsection (d).  Accordingly, to defeat Mr. John's motion to dismiss the State must establish by a preponderance of the evidence that Mr. John's use of deadly force exceeded the amount of force "necessary to prevent an injury or loss."[11]  Wyo. Stat. Ann. § 6-2-602(a).

[¶56]   The State relies on the postmortem examination and Detective Stedillie's testimony to argue Mr. John used excessive force because he was in no apparent danger when he fired the gunshots that struck Mr. Willow in the back.[12]  The State directs our attention to "the medical examiner[']s conclusion that [Mr.] Willow was disabled, but alive, when [Mr.] John fired the shot into [Mr.] Willow's back that ended his life."  The medical examiner's report identified Mr. Willow's probable cause of death as "[m]ultiple gunshot wounds."  The medical examiner identified 11 distinct wounds to the body that could have been caused by as few as nine bullets.  However, the report did not account for the circumstances in which the gunshot wounds were inflicted.  Those circumstances are set forth in the district court's findings.

[¶57]   The district court accounted for various witness statements when it found that Mr. Willow "started running toward" Mr. John and Mr. John "fired nine shots from the AR-15-

---

below.'"  *Williams v. Tharp*, 2017 WY 8, ¶¶ 10–11, 388 P.3d 513, 517 (Wyo. 2017) (quoting *Rock Springs Land & Timber, Inc. v. Lore*, 2003 WY 100, ¶ 35, 75 P.3d 614, 627 (Wyo. 2003)).

[11] Subsection (a)'s requirement that deadly force must be "necessary" embodies the fundamental common law principle that "[a] slaying committed after the danger has ceased to exist cannot be excused on the ground of self-defense.  A person loses his right to shoot again in self-defense after firing a shot which has so disabled his assailant that there is no longer any apparent danger."  *Patterson v. State*, 682 P.2d 1049, 1053 (Wyo. 1984) (citation omitted).

[12] The State also contends Mr. John had a duty to pursue reasonable alternatives to deadly force.  According to the State the reasonable alternatives of closing and locking the front door, calling 911, or "us[ing] alternative means of force" were available to Mr. John.  The amended statute leaves no room for consideration of the State's proffered alternatives where Mr. John used deadly force in his home in accordance with the requirements set forth in § 6-2-602(e), and where the presumptions set forth in § 6-2-602(b) and (d) soundly apply.

20

type rifle, in rapid succession, with no discernable break in time between those shots." The court noted that according to Mr. Heims, Mr. John "stepped back into [his] home when Mr. Willow charged up the steps[.]"; Mr. Willow moved "quickly," "he was angry," and he "mov[ed] toward the house with . . . an angry step." It further noted that, according to Ms. Hayden, "Mr. Willow sprinted straight for [Mr. John.]"

[¶58] On direct examination, Detective Stedillie testified that Ms. Hayden "recall[ed] one shot ringing out and then [Mr. Willow] rushing towards the front of the trailer." "There was a rapid succession of shots[.]" On cross-examination, Detective Stedillie confirmed Ms. Hayden "said that, once [Mr. John] started pulling the trigger, he didn't stop[.]" Mr. John's neighbor "said it sounded like an automatic," with "[o]ne shot right after another, semiautomatic, as fast as you can pull the trigger[.]" Ms. Hayden, Mr. Heims, and Mr. John's mother all spoke "words to that effect."

[¶59] In light of these circumstances the district court determined the encounter "escalated in mere seconds." Viewing the record and the court's findings in the light most favorable to the district court's decision, *Dixon v. State*, 2019 WY 37, ¶ 17, 438 P.3d 216, 226 (Wyo. 2019), we find no error in its conclusion that Mr. John used necessary force. *Cf. Patterson*, 682 P.2d at 1050–51, 1053 (concluding no competent evidence supported self-defense jury instructions when there was a gap in time between the perceived danger and the use of deadly force).

[¶60] Nor did the court err when it determined "the State [did] not [meet] its burden to establish that probable cause exists to conclude that [Mr. John's] use of force was not statutorily justified[.]" Because the State did not satisfy the probable cause standard, it rationally follows that the State did not satisfy the higher preponderance of the evidence standard. *See Phippen v. State*, 2013 WY 30, ¶ 14, 297 P.3d 104, 108 (Wyo. 2013) (citing *Florida v. Harris*, 568 U.S. 237, 243–44, 133 S.Ct. 1050, 1055, 185 L.Ed.2d 61, 67–68 (2013)). The district court therefore properly granted Mr. John's motion to dismiss.

## *CONCLUSION*

[¶61] We affirm the district court's "Order Dismissing Case Following W.S. 6-2-602 Hearing."